Linell LONG, Johnie Pinkard, and Joe L. McElroy, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

**GEORGIA KRAFT COMPANY, Defendant.**

Linell LONG, Johnie Pinkard, and Joe L. McElroy, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

**INTERNATIONAL BROTHERHOOD OF PULP, SULPHITE AND PAPERMILL WORKERS, AFL–CIO et al., Defendants.**

Civ. A. Nos. 2033, 2103.

United States District Court, N. D. Georgia, Rome Division.

March 3, 1970.

On Motion for Further Relief Jan. 8, 1971.

---

19. 12 C.F.R. § 220.3(e).

20. 429 F.2d at 1148.

682

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., Jack Greenberg, Gabrielle Kirk, New York City, for plaintiffs.

Smith & Schnacke, Dayton, Ohio, Matthews, Walton, Smith, Shaw & Maddox, Rome, Ga., for Georgia Kraft Co.

John R. Goldthwaite, Jr., Atlanta, Ga., for defendant Unions.

Hamilton, Anderson & Minge, Rome, Ga., for Local No. 804.

Bobby Lee Cook, Summerville, Ga., for Local No. 654.

SIDNEY O. SMITH, Jr., Chief Judge.

This is a class action wherein plaintiffs seek injunctive relief and money damages against defendants for alleged racial discrimination in employment practices. They originally asked for injunctive relief relating to the following matters: (1) requirement that Negro employees seeking promotion or transfer and/or applicants for employment pass a test or tests, except insofar as these

tests comply with 42 U.S.C. § 2000e–(a) and (h); (2) requirement that Negro employees seeking transfer or promotion to jobs formerly reserved for white employees pass any test which white persons presently holding the jobs were not required to pass, or any test that was required of them because of their race or color at the time of employment; (3) the utilization of a promotion system that takes into account only service on a particular job, and more particularly, from failing or refusing to adopt a non-discriminatory promotion system based on total years of plant service; (4) maintenance of segregated locker room facilities; (5) maintenance of the "Kraftsman's Club" on a segregated basis; (6) refusing to allow Negro employees to hold any positions wherein they supervise white employees; (7) maintaining separate lines of progression, on the basis of race or color; (8) entering into any contract or contracts which discriminate against any class or group of employees on the basis of their race or color; (9) maintaining any policy or practice which is intended to deny because of race or color the full rights of plaintiffs and their class the right to enjoy equal employment opportunities; (10) failing to represent, timely notify, or properly grieve on behalf of any individual or group on the basis of race or color.

The complaints in the two actions are substantially identical. No. 2033 was originally brought against all defendants but was dismissed by the Court as to the Union defendants because the charge filed with the Equal Employment Opportunity Commission, upon which that action was based, had not been served upon the Union defendants before the issuance of the statutory suit letter. Subsequently, the charge was served and the action was re-instituted. Thereafter the parties engaged in conciliation under the auspices of the Equal Employment Opportunity Commission and a tentative agreement which, if consummated, would have settled these actions was reached.

However the proposed conciliation agreement was rejected by the vote of the membership of Local Union No. 804 of the Pulp, Sulphite and Papermill Workers, and of Local Union 654 of the United Papermakers and Paper Workers. The objections of the two Local Unions to the conciliation agreement concentrate upon the portions of the conciliation agreement which effected amendments to the seniority and job progression provisions of the collective bargaining agreement covering the operations of the Krannert Division.

On November 26, 1969, a conference of the parties was held, to ascertain the precise areas of disagreement. It was decided to attempt to arrive at a stipulation of facts, from which the Court could work in making findings of law and deciding to what relief, if any, plaintiffs were entitled. By order entered that day, the testing issues were severed. The parties have stipulated that Georgia Kraft Company has eliminated discrimination, if any, in locker room facilities, and membership in the Kraftsman's Club. The remaining issues resolved themselves into disputes over whether Georgia Kraft's existing seniority system was unlawfully discriminatory under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., and the nature of the appropriate remedy for any such discrimination. Collaterally, issue was raised as to whether the formerly all-white locals had engaged in any such discrimination, so as to be appropriate objects of any remedy granted.

The cause came on for trial on the disputed issues. Where appropriate, stipulations of fact were made. The proposed Conciliation Agreement was introduced into evidence for the sole purpose of advising the Court of the positions of the Company and the two International Unions on the appropriate scope of relief. The Court has reached its own conclusions regarding contested issues of fact from other evidence in the record.

Pursuant to such evidence, the Court makes the following

## FINDINGS OF FACT

(1) These suits were instituted by plaintiffs seeking relief for racial discrimination violating Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq.

(2) Defendant Georgia Kraft Company is a corporation whose Krannert Division operates a paper mill in Rome, Georgia, manufacturing paper used in corrugated cardboard.

(3) Defendant International Brotherhood of Pulp, Sulphite and Papermill Workers is the certified collective bargaining agent for certain employees at the Krannert Division of Georgia Kraft Company, located at Rome, Georgia. It maintains Local Unions 804 and 805 for its members at Krannert Division.

(4) Defendant United Papermakers and Paper Workers, AFL-CIO, is the certified collective bargaining agent for certain other employees at the Krannert Division of Georgia Kraft Company, at Rome, Georgia. It maintains Local Union 654 for its members at Krannert Division.

(5) When these suits were filed, plaintiffs Johnie Pinkard, Linell Long and Joe L. McElroy were Negro employees of the Krannert Division of Georgia Kraft. All three had been hired before May 15, 1963, and were members of Local 805, International Brotherhood of Pulp, Sulphite and Papermill Workers, AFL-CIO. At that time Linell Long was President of Local 805.

(6) The Krannert Division of Georgia Kraft Company was opened in 1954. Shortly thereafter, the Company and the defendant Unions executed a collective bargaining agreement, which has been succeeded by a series of agreements, the latest of which went into effect on August 28, 1968, and expires August 28, 1971. Each of those agreements has provided for a seniority system incorporating job seniority rather than mill seniority as a substantial factor in promoting and laying off employees at the Krannert Division. The Company, the two international unions, and each of the defendant locals negotiated, ratified or were parties to those agreements.

(7) The seniority system currently in effect at the Krannert Division of Georgia Kraft Company governs promotions and layoffs throughout a number of lines of progression.

A. *Promotion within a line of progression.* A line of progression is a series of jobs through which an employee progresses by promotion to successively higher paying jobs. Under the collective bargaining agreement currently in force there are eleven such lines of progression at the Krannert Mill. (Exhibit A). An employee enters a line at the lowest paying job and thereafter progresses to successively higher paying jobs based on job seniority and job qualifications. When an opening occurs at a higher paying job in a line of progression, and the job qualifications of bidding employees are relatively equal, according to the collective bargaining agreement, the promotion is given to the employee with the most job seniority in the job immediately below the open job, in the same line of progression. Where two employees have been on that next lower job the same amount of time, the promotion goes to the one who has more job seniority on the job below that—and so on, down the line of progression. If job seniority at all levels in the line of progression is also equal, then the employee with the most plant seniority receives the promotion.

Job seniority in any one job includes time worked in it and time worked in all higher jobs in the same line of progression. Additionally, an employee accumulates job seniority on his own job and simultaneously on all jobs then below it in the same line of progression.

B. *Transfer to a line of progression.* New employees are assigned to the "Auxiliary Crew", a general manpower pool. When a permanent opening occurs at the lowest paying job in a line of pro-

gression ("entry level job"), employees in other lines of progression are given the opportunity to request transfer to the opening. If no qualified employee in another line of progression requests transfer, the Company assigns an Auxiliary Crew employee to the opening. In either case, insofar as seniority is a factor in filling the opening, plant seniority governs.

C. *Jobs in no line of progression.* In addition to the jobs classified in lines of progression, there are also a number of jobs in no line of progression. Some of these are permanent jobs, while others are filled only occasionally, and for temporary periods, as the need arises.

(8) Prior to May 15, 1963, the company filled permanent openings in certain lines of progression (Nos. 1, 3–6 and 8–11, Exhibit A) with only white employees. Jobs in these lines were under the jurisdiction of Local 804 and Local 654. At the same time, black employees seeking permanent assignment to a line of progression were limited to two lines of progression, under the jurisdiction of Local 805. (Nos. 2 and 7, Exhibit A). During the same period, openings in certain of the jobs in no line of progression ("dead end jobs") were filled with only white employees (trackman, labor leader, and equipment operator), while openings in other such jobs were filled with only black employees, (chip bin man, laborer (painter), machine shop attendant, power plant attendant, unloader, truck driver, cement finisher, automotive utility man, lime handler, gardener, and truck driver). Jurisdiction over these jobs was similarly divided between white and black Locals.

(9) These practices were reflected in Georgia Kraft Company's hiring policies. Prior to May 15, 1963, all white applicants were given a battery of tests, and if they successfully passed them, were hired and assigned to the Auxiliary Crew for the "white" lines of progression and dead-end jobs. Negro applicants were not required to take the tests, but were only hired and assigned to openings in the "black" lines of progression, or in the "black" dead-end jobs.

(10) On May 15, 1963, Georgia Kraft Company opened the previously white lines of progression to black employees by permitting existing Negro employees and new Negro applicants to take the Company's tests. Negro applicants were not required to take these tests, but assignment or transfer to the previously all white lines of progression was conditioned upon passing the tests, even in the case of existing Negro employees.

(11) On April 5, 1965, Georgia Kraft Company began requiring all job applicants, white or black, to pass a battery of tests before employment. All such new employees were allowed to enter any of the lines of progression and any of the "dead-end" jobs. But Negro employees hired before that date who had not taken or passed the applicable tests were still not permitted to enter the previously all white lines of progression or dead-end jobs unless and until they passed the tests.

(12) Notwithstanding the changes instituted on May 15, 1963, and on April 5, 1965, the evidence shows that as of May 15, 1969, Georgia Kraft Company employed one hundred Negroes listed on its Seniority Roster. Only nineteen of those men were in jobs listed as paying a rate in excess of $2.90 per hour. None were in jobs listed at a rate in excess of $4.00 per hour, and only six were in jobs listed at a rate in excess of $3.10 per hour. Only twenty-five of the hundred held jobs outside the two traditionally all-Negro lines of progression (Nos. 2 and 7, Exhibit A). Of these twenty-five, thirteen held "dead-end" jobs, not in any line of progression, paying $2.80 per hour or less. Seven of the remaining twelve held entry level jobs in various lines of progression. In short, only five Negroes had reached jobs above entry level in the formerly all white lines of progression, and three of these men still worked in the Wood

Yard, one as a Scaler, and two as control tower men. As of May 15, 1969, according to the Seniority Roster (Exhibit B), not one Negro had managed to enter the Liquor Section of the Pulp Mill (No. 3, Exhibit A), or the Paper Mill (No. 8, Exhibit A), the two highest paying lines of progression.

The same evidence shows that of the eighty-one Negroes hired before May 15, 1963, forty-four have mill seniority dating from January 1, 1958, or earlier. Their seniority was compared to that of the white employees holding the medial range of jobs in each of the eight previously all-white lines of progression for which the Court had statistics. The highest one to three jobs in each line of progression were ignored, because almost without exception they are filled by men whose mill seniority dates from October 1, 1954; the lowest one or two jobs in each line of progression were ignored, because the relevant seniority factor at entry level is mill seniority. The comparison thus encompassed thirty-four jobs at which one hundred eighty men were employed, as of May 15, 1969. One hundred seventy-six of those men were white, and one hundred three of those white men had *less* mill seniority, but perforce more job seniority than that of the forty-four Negro employees designated above.

(13) In many instances, the jobs in a line of progression are functionally related. That is, the training received, the skills developed, and the experience accumulated on one job also partially prepares an employee to perform one or more higher paying jobs in the same line of progression. Also, throughout the Mill, it is the policy of Georgia Kraft Company to fill temporary absences due to illness or vacation with employees from the next lower job in the same line of progression, where it is not possible for employees performing the same job on other shifts to 'cover' for the ill or vacationing employee. And finally, it is recognized that in some cases employees in several successive jobs in the same line of progression work as a team, or in close proximity, so that the interrelation and close association acquaints an employee holding one job with the duties of, and the skills necessary for performing, one or more jobs higher in the line of progression than is his own.

Therefore, job seniority, as a substantial factor in the promotion and laying off of employees within a particular line of progression to a significant degree contributes to mill efficiency. It is not, however, *necessitated* by either efficiency or safety considerations.

(14) On October 29, 1969, the plaintiffs submitted a Report on the Negotiation and conciliation undertaken with the EEOC pursuant to the provisions of Title VII of the Civil Rights Act of 1964. The report contained a proposed Conciliation Agreement, in which certain recommendations were made to alter the lines of progression. *Cf.* Exhibit B with Exhibit A. Recommendations were also made that in certain instances Negro employees be allowed to enter a line of progression at a job higher than the lowest paying job in the line, and be permitted to advance within the line by promotion to jobs higher than the one immediately above the slot in which they find themselves when such vacancies become available.

In line with the recommendations, the evidence reflects qualified expert opinion that tenure in the designated normal entry level jobs and the jobs proposed to be skipped, in the case of well qualified Negro employees, does not provide training or experience absolutely necessary for the safe or efficient performance of the jobs higher up in the line of progression, to which jobs entry or promotion is permitted.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of this action pursuant to Section 706(f) of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000e–5(f).

(2) Defendant Georgia Kraft Company is an employer engaged in an industry affecting commerce within the meaning of Section 701(b) of the Civil

Rights Act of 1964, 42 U.S.C.A. § 2000e(b).

(3) The United Papermakers and Paper Workers, AFL-CIO, its Local 654, and the International Brotherhood of Pulp, Sulphite and Paper Mill Workers and its two Locals 804 and 805 are labor organizations engaged in an industry affecting commerce within the meaning of Sec. 701(d) (e) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e(d) (e).

(4) The scope of the class represented by plaintiffs (the "affected class") is all Negro employees of the Krannert Division of Georgia Kraft Company hired before April 5, 1965.

(5) The employment policies and practices of Georgia Kraft Company prior to May 15, 1963, described above, constitute racial discrimination against Negro employees at the Krannert Division. If practiced after the effective date of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., such discrimination would be an unlawful employment practice under the Act. 42 U.S.C.A. § 2000e-2(a).

■ Because of the situation engendered by such racial discrimination, a seniority system incorporating "job security" as a substantial factor in promoting and laying off employees at the Krannert Division of Georgia Kraft Company has the present effect of unlawfully discriminating against Negro employees at the Mill, whenever members of the affected class compete against white employees for promotions or during layoffs, in that:

(A) under such a system, some Negro employees previously discriminated against would be unsuccessful in bidding against white employees with less mill seniority for available job vacancies higher in the lines of progression, solely because the junior white employees, on the basis of their race and color, had obtained greater seniority on jobs in lines of progression previously closed to Negroes;

(B) additionally under such a system, some qualified Negro employees who have greater mill seniority, would remain perpetually beneath less senior white employees in terms of pay and place in the lines of progression, because the opportunity of obtaining seniority on jobs in such lines of progression had previously been denied Negro employees solely on the basis of race.

Such a seniority system is a "term, condition and privilege of employment" that discriminates against Negro employees on the basis of race in violation of Section 703(a) of the Civil Rights Act of 1964. Local 189, United Papermakers and Paperworkers A. F. L.–C. I. O., C. L. C. v. United States, 416 F.2d 980 (5th Cir. 1969), aff'g 282 F.Supp. 39 (E.D. La. 1968); *see also* 301 F.Supp. 906 (E. D.La.1969).

(6) In that each of the defendants, subsequent to the effective date of the Civil Rights Act of 1964, negotiated, ratified or became a party to one or more collective bargaining agreements which provided for a seniority system at the Krannert Division of Georgia Kraft Company based substantially on job seniority rather than mill seniority, each has substantially contributed to the continuation of such a seniority system, and has therefore intentionally engaged in unlawful employment practices within the meaning of Section 706(g) of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-5(g). *See* United States by Clark v. Local 189, United Papermakers and Paperworkers, 301 F.Supp. 906 (E.D.La. 1969).

■ (7) As to remedy, the course of the law is not yet clear. This Court was originally of the opinion, from the legislative history, that the act did not admit any interference into existing seniority rules as established by collective bargaining agreements in effect prior to the effective date of the act. Culpepper v. Reynolds Metals Co., 296 F.Supp. 1232 (N.D.Ga.1969), rev'd. on other grounds 421 F.2d 888 (5th Cir. 1970). However such decision preceded the Fifth Circuit opinion in the case of Local 189, United Papermakers and Paperworkers A. F. L.

–C. I. O., C. L. C. v. United States, *supra*. That case is a firm command to bypass a preexisting system of job seniority in favor of mill or plant seniority whenever a member of a class previously discriminated against competes with a non-member of the class for job openings in a line of progression. This for the reason that the perpetuation of a job seniority systems existing prior to the act must yield because of the "historical discrimination that undergirds them." See also United States v. Sheet Metal Wkrs. Int. Assn., Local U. 36, 416 F.2d 123 (8th Cir. 1969); N. L. R. B. v. Local 269, Int'l. Bro. of Electrical Workers, 357 F.2d 51 (3rd Cir. 1966); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). Thus it is plain that competition on the basis of mill seniority must supplant a job seniority system from which members of the "affected class" have been locked out in the past. The court will so order.

■ Over and beyond such relief, the plaintiffs insist and the EEOC has recommended that other remedial steps be taken by the court to equate instantly the starting point for the new promotion system by the device of "advanced level entry" and "job skipping" within the established lines of progression. While the court is impressed by the arguments and evidence in this respect, it is most reluctant to initiate any such action. Most judges lack the industrial expertise to restructure a going business in this fashion. Here, an investment of close to $100,000,000 and the jobs of some 800 unionized workers lie in the balance. The complexity of the testimony in this case, even when aided by a trial by view of the mill operation, emphasizes the problem. While it is true that the task can technically be accomplished by a judge's reaction to expert testimony, it resolves itself into yet another area of a court functioning in the role of a supervisory administrator for which few, if any, are qualified. On principle and as precedent, then, the court does not feel that such remedies are anticipated by the act nor are they a wise course for the courts to pursue. Our law has a strong policy in favor of the resolution of such questions through the collective bargaining processes. 29 U.S.C.A. § 141; 29 U.S.C.A. § 158(d). That favored system has been in operation at this mill since its construction over 15 years ago. In the area of job classification, lines of progression, and the orderly functioning of labor-management relations, the courts are particularly admonished to abstain. 29 U.S.C.A. § 185; N. L. R. B. v. Insurance Agents' Int'l. Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). The court is aware of the results in "Local 189 #2" at 301 F.Supp. 906 (E.D.La.1969). However, as yet there is no definitive authority requiring such a course of action. The enormity of the problem in terms of General Motors, Lockheed, and other large employers is overwhelming. Thus, while the court is sympathetic with these particular plaintiffs in their efforts to "catch up" in the system, it declines to institute such drastic procedures except where there has been consent by the parties. On the facts, there is a great temptation here to combine the lowest two jobs into one level in several lines of progression and refrain from obvious "advanced entry" or "skipping". However, such action is inconsistent. As Negroes achieve their rightful place in the economic society along with political and social equality, there are always older pioneers who cannot instantly achieve the places which lie in promise for the younger. The Equal Employment provisions of the Civil Rights Act of 1964 portend a new day which must have a beginning point. In this area, the replacement of job seniority with mill seniority appears to be the soundest basis for such origin.

This is not to. say that the company and the unions could not by the collective bargaining process be guilty of future discrimination. The opportunity to do so is ever present. *See* Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Hopefully, it will not occur. Partially for this reason and in order to take advantage of any new developments in the law, the court will retain jurisdiction beyond the expiration of the current

contracts, athough the order which follows is final.

### DECREE

(I) Accordingly, the Georgia Kraft Company, the United Papermakers and Paperworkers, its Local Union 654, the International Brotherhood of Pulp, Supphite and Paper Mill Workers, and its Local Unions 804 and 805, their officers, agents, employees, servants and all persons in active concert or participation with them, are hereby permanently enjoined and restrained from discriminating against the Negro employees of the defendant Krannert Division of Georgia Kraft Company at Rome, Georgia, in violation of Title VII of the Civil Rights Act of 1964.

In particular, the defendants are ordered to abolish the existing seniority system based substantially on job seniority, and to refrain from negotiating or implementing any other seniority system designed to discriminate or having the effect of discriminating against Negro employees, insofar as such systems may apply to permanent job assignments, and permanent promotions and layoffs of employees in the affected class, in competition with other employees at the Krannert Division of Georgia Kraft Company.

In place of the seniority system so abolished, the defendants are ordered to implement and permanently continue a system of mill seniority with respect to permanent job assignment and permanent promotions and layoffs of employees in the affected class, so that in making permanent promotions or demotions within a line of progression, or in making permanent transfers, promotions or demotions to or from a line of progression, when employees of the affected class are competing with employees not of the affected class, and the qualifications of the competitors are relatively equal, mill seniority rather than job seniority shall govern. Georgia Kraft Company shall not discriminate on the basis of race in making any temporary assignments, promotions, lay-offs or demotions at its Krannert Division.

Mill seniority shall be determined on the basis of the length of continuous service with the Krannert Division of Georgia Kraft Company since September 30, 1954. *Continuous service* shall be interpreted in accordance with the four provisions set forth on Page 20 of the existing collective bargaining agreement.

*Qualifications* as used immediately above and elsewhere in this decree shall be deemed to refer to (1) ability and fitness, (2) knowledge and training, and (3) experience and skill, developed during an employee's tenure at the Mill. Where a member of the affected class with higher mill seniority competes for a job with a non-member having lower mill seniority, the latter shall not be deemed more qualified for the promotion simply because of ability, fitness, knowledge, training, experience or skill which are the product of his longer tenure in job slots immediately below the vacancy. Obviously, such abuse of these factors would emasculate this decree by perpetuating job seniority in the name of preserving the Company's right to assess qualifications in making promotions, and must be enjoined.

(II) The defendants are hereby ordered to implement the changes in the lines of progression at the Krannert Division of Georgia Kraft Company reflected in Exhibit B.

(III) In making permanent promotions within a line of progression, or in making transfers, promotions or demotions to or from a line of progression, the lowest paying job in each line of progression shall be the proper job for beginning in the line, and proper progression shall be to the job next higher than that currently held by the employee, with the following exceptions.

1. In a promotion within the Woodyard or Service Crew lines of progression, upon a showing that an employee of the affected class has the ability to perform a job in the line of progression higher than the job next above the job he currently holds, the employee may apply for the higher job and may skip the intermediate jobs in the line

in accordance with the seniority provisions of the Collective Bargaining Agreement, provided the intermediate jobs to be skipped provide no essential training or experience for higher jobs within the line of progression.

2. In a transfer or promotion to the Woodyard or Service Crew lines of progression, upon a showing that an employee of the affected class has the ability to perform a job higher than the bottom job in such line, the employee may apply for such job and may skip the intermediate jobs in the line in accordance with seniority provisions of the Collective Bargaining Agreement, provided the intermediate jobs to be skipped provide no essential training or experience for higher jobs within the line of progression.

Ordering implementation of these exceptions is merely entry of a consent decree. All parties to the collective bargaining agreement, including the local unions, agreed to advanced level entry and job skipping in the Woodyard and Service Crew lines of progression.

Normal seniority provisions, without the modifications of this Decree, shall prevail in making permanent promotions or demotions:

1. When employees not of the affected class compete with each other, such as when no employees in the job classification from which the promotion or demotion is to be made are of the affected class, or when there are two or more employees not of the affected class who have longer Company service than an affected class employee in the job classification from which the promotion or demotion is to be made.

2. When employees of the affected class compete with each other, such as when all employees in the job classification from which the promotion or demotion is to be made are of the affected class, or when there are two or more employees of the affected class who have longer Company service than an employee who is not of the affected class in the job classification from which the promotion or demotion is to be made.

The provisions set forth above in this Decree shall be applicable to the recall of employees to entry jobs in lines of progression from which they have been displaced due to permanent demotions.

(IV) The defendant United Papermakers and Paperworkers, its Local 654, the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, and its Locals 804 and 805, their officers, agents, members, employees, servants, and all persons and organizations in active concert with them, are hereby enjoined and restrained from interfering with or hindering,—by striking, threatening to strike, or otherwise—the compliance by all defendants with the foregoing provisions of this order.

### ATTORNEY'S FEES

For the services rendered prior to October 1, 1969, plaintiff's attorney shall receive the reasonable fee of $3,500.00, to be paid one-half by Georgia Kraft Company and one-half by the defendant unions excluding Local 805 of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers. The one half to be paid by the unions shall be divided equally between the International Unions and their locals (excluding Local 805), unless otherwise agreed.

For the services rendered since October 1, 1969, and to date, plaintiff's attorney shall receive an additional fee of $1,500.00. The motions of the Company and the International Unions to the effect that they not be taxed with such expense are granted. Accordingly, such sum shall be paid one-half each by defendant Local 654 and defendant Local 804.

### JURISDICTION

The Court will retain jurisdiction of this cause for a period of two years. During such time, any party may by motion request modification of this Order in light of new factual or legal developments.

It is so ordered.

EXHIBIT A
## GEORGIA KRAFT COMPANY
### KRANNERT DIVISION

| DEPARTMENT, JOB TITLE & UNION JURISDICTION | Present Rate Eff. |
|---|---|
| | 8/25/69 |
| **Wood**      Line 1      Local 804 | |
| Wood Operator | $4.035 |
| Crane Operator (After 12 mo.) | 4.200 |
| Crane Operator (After 6 mo.) | 3.900 |
| Crane Operator (Start) | 3.845 |
| Scaler | 3.645 |
| Control Tower Man | 3.595 |
| Knife Grinder | 3.480 |
|      Line 2      Local 805 | |
| Chipper Feeder | 3.190 |
| Chipper House Relief Man | 3.025 |
| Chip Unloader | 3.000 |
| Splitterman | 2.970 |
| Truck Unloader | 2.945 |
| Crane Laborer | 2.915 |
| Laborer (After 90 days) | 2.830 |
| Laborer (Start) | 2.720 |
|      Local 805 | |
| Chip Bin Man | 2.885 |
|      Local 805 | |
| Woodyard Truck Driver (when used) | 2.885 |
|      Line 3      Local 804 | |
| **Pulp Mill—Liquor Section** | |
| Recovery Operator | 4.530 |
| Assistant Recovery Operator | 4.140 |
| Evaporator Operator | 4.085 |
| Caustic Operator | 3.980 |
| Lime Kiln Operator | 3.865 |
| Recovery Helper A | 3.750 |
| Recovery Helper B | 3.710 |
| Caustic Helper | 3.415 |
| Combination Helper | 3.210 |
| Recovery 2nd Helper A | 3.165 |
| Recovery 2nd Helper B | 3.110 |
|      Line 4      Local 804 | |
| **Pulp Mill—Stock Section** | |
| Digester Cook | 4.455 |
| Washer Operator | 4.340 |
| Assistant Washer Operator | 3.910 |
| Washer Screen Man (When Used) | 3.815 |
| Cook Helper A | 3.690 |
| Cook Helper B | 3.615 |
| Washer Helper B | 3.595 |
| Washer Helper C | 3.345 |
| Washer 2nd Helper (When Used) | 3.270 |
| Caustic 2nd Helper—Utility | 2.990 |
| Pulping Helper—Utility | 2.920 |

GEORGIA KRAFT COMPANY
KRANNERT DIVISION

| DEPARTMENT, JOB TITLE & UNION JURISDICTION | Present Rate Eff. |
|---|---|
| | 8/25/69 |
| Line 5     Local 804 | |
| Control Laboratory | |
| Service Operator | $4.090 |
| Senior Laboratory Assistant | 3.930 |
| Paper Tester | 3.690 |
| Assistant Paper Tester | 3.490 |
| Laboratory Assistant | 3.445 |
| Stock Tester | 3.300 |
| Sample Clerk | 3.250 |
| Routine Tester | 3.025 |
| Freeness Tester | 2.960 |
| Assistant Sample Clerk | 2.905 |
| Utility Man | 2.865 |
| Line 6     Local 804 | |
| Stores | |
| Receiving Clerk | 3.625 |
| Senior Storeroom Clerk | 3.540 |
| Shift Counter Clerk (After 12 Mos.) | 3.465 |
| Shift Counter Clerk (After 6 Mos.) | 3.140 |
| Shift Counter Clerk (Start) | 2.990 |
| Day Counter Clerk (After 12 Mos.) | 3.435 |
| Day Counter Clerk (After 6 Mos.) | 3.110 |
| Day Counter Clerk (Start) | 2.960 |
| Local 804 | |
| Service Crew | |
| Trackman & Labor Leader | 3.595 |
| Local 804 | |
| Equipment Operator | 3.615 |
| Line 7     Local 805 | |
| Labor Leader | 3.375 |
| Clean-up Truck Driver | 3.205 |
| Clean-up Truck Driver Helper | 2.945 |
| Yard Truck Driver | 2.945 |
| Track Repairman | 2.885 |
| Janitor | 2.830 |
| Laborer (After 90 days) | 2.830 |
| Laborer (Start) | 2.720 |
| Local 805 | |
| Laborer (painter) | 2.935 |
| Local 805 | |
| Cement Finisher (When Used) | 3.270 |

## GEORGIA KRAFT COMPANY
## KRANNERT DIVISION

| DEPARTMENT,  JOB TITLE  &  UNION JURISDICTION | Present Rate Eff. |
|---|---|
| | 8/25/69 |

| | |
|---|---|
| Local 805 | |
| Automotive Utility Man (When Used) | $2.945 |

| | |
|---|---|
| Local 805 | |
| Lime Handler (When Used) | 2.915 |

| | |
|---|---|
| Local 805 | |
| Gardener (When Used—Limited to One) | 2.885 |

| | |
|---|---|
| Local 805 | |
| Truck Driver (When Used) | 2.885 |

| | |
|---|---|
| Local 805 | |
| Maintenance | |
| Machine Shop Attendant | 2.895 |

| Line 8       Local 654 | |
|---|---|
| Paper Mill | |
| Machine Tender | 5.080 |
| Back Tender | 4.645 |
| Third Hand | 4.245 |
| Fourth Hand | 3.715 |
| Fifth Hand | 3.345 |
| Sixth Hand | 3.150 |
| Starch Mixer | 3.060 |
| Seventh Hand | 2.990 |
| Utility Man | 2.865 |

| Line 9       Local 654 | |
|---|---|
| Stock Processing | |
| Refiner Operator | 4.400 |
| Refiner Helper | 3.625 |
| Refiner 2nd Helper | 3.280 |
| Broke Operator | 3.165 |
| Broke Helper | 2.905 |

| Line 10       Local 654 | |
|---|---|
| Finishing & Shipping | |
| Shipping Clerk | 3.865 |
| Scale Man and Bander | 3.570 |
| Scale Man and Bander Helper | 3.430 |
| Lift Truck Operator | 3.280 |
| Stenciller | 3.205 |
| Conveyor Man | 3.060 |
| Roll Finisher | 3.025 |
| Senior Car Loader | 2.915 |
| Car Loader | 2.895 |

GEORGIA KRAFT COMPANY
KRANNERT DIVISION

| DEPARTMENT, JOB TITLE & UNION JURISDICTION | Present Rate Eff. |
|---|---|
| | 8/25/69 |

Line 11      Local 654

Power

| | |
|---|---|
| Turbine Operator | $4.485 |
| Boiler Operator | 4.390 |
| Water Tender | 4.015 |
| Assistant Turbine Operator | 3.760 |
| Auxiliary Operator | 3.645 |
| Assistant Boiler Operator | 3.435 |
| Bark Fireman | 3.320 |
| Power Helper | 3.025 |

Local 805

| | |
|---|---|
| Power Plant Attendant | 2.895 |

Local 805

| | |
|---|---|
| Unloader | 2.970 |

EXHIBIT B

WOODYARD

LINE OF PROGRESSION

| | | Rate Currently In Effect |
|---|---|---|
| Wood Operator | | $4.305 |
| Crane Operator | (After 12 Mos.) | 4.200 |
| | (After 6 Mos.) | 3.900 |
| | (Start) | 3.845 |

Control Tower Man—$3.595      Sealer—$3.645      Knife Grinder—$3.480

| | | |
|---|---|---|
| Chipper Feeder | | 3.190 |
| Chipper House Relief Man | | 3.025 |
| Chip Unloader | | 3.000 |
| Splitterman | | 2.970 |
| Truck Unloader | | 2.945 |
| Crane Laborer | | 2.915 |
| Chip Bin Man | | 2.885 |
| Laborer | (After 90 Days) | 2.830 |
| | (Start) | 2.720 |

SERVICE CREW

LINE OF PROGRESSION

| | | Rate Currently In Effect |
|---|---|---|
| Equipment Operator | | $3.615 |
| Trackman & Labor Leader | | 3.595 |
| Labor Leader | | 3.375 |
| Clean-Up Truck Driver | | 3.205 |
| Clean-Up Truck Driver Helper | | 2.945 |
| Yard Truck Driver | | 2.945 |
| Track Repairman | | 2.885 |
| Janitor | | 2.830 |
| Laborer | (After 90 Days) | 2.830 |
| | (Start) | 2.720 |

## On Motion for Further Relief

Plaintiffs have moved the Court for further relief in connection with the merger of Locals 804 (previously all white) and 805 (previously all black) of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers. From the exhibits attached to the motion, it appears that after the Locals failed to agree upon the terms of a voluntary merger, the International revoked the charter of 805 and declared that the membership of Local 805 would become members of Local 804, and thereafter be represented by the surviving Local.

Plaintiffs request that the merger be enjoined and that the defendants International and Local 805 be ordered to show cause why the merger should not take place on certain terms and conditions, or in the alternative that an injunction be issued maintaining the *status quo* while the proposed merger is referred to the EEOC for conciliation. The terms and conditions which plaintiffs wish written into the merger include the creation of a new office and the filling of that and other (merged) Local 804 offices with former Local 805 members for an interim period; interim representation of former Local 805 members on existing Local 804 committees; the right of the Woodyard and Service Crews to select their own shop stewards (whereas shop stewards are generally appointed by the Local President); and insulation of the members and funds of former Local 805 from any liability for any award of attorney's fees or other award to the plaintiffs in this case. Such relief was ordered in Hicks v. Crown Zellerbach Corp., 310 F.Supp. 536 (E.D.La.1970), and plaintiffs urge that this Court likewise protect the former members of Local 805 from being immediately submerged in the larger membership of Local 804.

■ The action of the International merging the two locals does not consti-tute a violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000e et seq. Where a union has allowed the existence of segregated locals, arguably in violation of Title VII, it is not unreasonable or arbitrary to voluntarily discontinue the practice by revoking the charter of the smaller local and requiring that its members become members of the larger one. In the instant case, Local 804 had more than twice as many members as did Local 805. Affidavit of Jesse W. Whiddon, Sr., October 12, 1970, p. 4.

The "loss" of their offices by Local 805 officers is simply a necessary incidence of the merger. While the former members of Local 805 will "lose" representation through the merger, it is only in the sense that the officers they collectively elected are not carried through the merger. While the Court can question the wisdom of not affording the former members of Local 805 interim formal representation among Local 804's officers or on its committees—perhaps until the next election—the Court cannot say that that failure constitutes a violation of Title VII. And, clearly, once elections are held, the former members of Local 805 cannot be heard to complain because they no longer have the same opportunity to elect union officials of their own choice as they did before merger. The merger of two groups means that the smaller of the two will necessarily lose its autonomy. As long as the former members of Local 805 have the same franchise, and are equally eligible for election as their white counterparts in Local 804 when the next elections are held, there can be no grounds for complaint. The abolishment of two segregated unions into one with equal rights to all individual members, regardless of race or color, is the ultimate objective of the Act and such has been accomplished here. Accordingly, the request for interim formal representation of former Local 805 members in Local

804 offices, on its committees, and as shop stewards, is denied.

■ However, with respect to liability for awards and attorney's fees assessed against Local 804 in this action, and for costs and attorney's fees incurred by Local 804 in defending this action, the Court intends to the extent possible to make certain that the plaintiffs do not inadvertently pay for their own victory. Accordingly, the International Brotherhood of Pulp, Sulphite and Paper Mill Workers and its Local 804 are hereby enjoined from using the funds of former Local 805 to satisfy awards and attorney's fees assessed against Local 804 in this action or to pay the costs and attorney's fees incurred by Local 804 in defending this action, and from otherwise requiring the former members of Local 805 to bear any part of the cost of making such satisfaction or payment. This injunction is intended to insulate the funds of Local 805 transferred to Local 804 from such use, and to exempt the former members of Local 805 from any special assessment or dues increase made necessary by such awards, costs and attorney's fees. The Court does not intend to prohibit Local 804 from using the funds it had on hand before merger to satisfy its above obligations, even though such use ultimately means less money is available to the merged Local as a result of this lawsuit. Moreover, if such awards, costs and attorney's fees exceed the funds Local 804 had on hand before the merger, the merged Local 804 may also use the funds acquired by normal dues collections after the merger, provided its actions regarding its finances have been in good faith, and were not designed to require its new members to bear part of cost of making the satisfaction or payment described above.

Except to the extent so provided, the temporary restraining order is dissolved and the injunction denied.

It is so ordered.