Linell LONG et al., Plaintiffs-Appellants,

v.

GEORGIA KRAFT COMPANY et al., Defendants-Appellees.

No. 71–1476.

United States Court of Appeals, Fifth Circuit.

Jan. 28, 1972.

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., William L. Robinson, Lowell Johnston, Jack Greenberg, New York City, for plaintiffs-appellants; George Cooper, Paul Sherman, New York City, of counsel.

Oscar M. Smith, Rome, Ga., Dean E. Denlinger, Smith & Schnacke, Dayton, Ohio, for Georgia Kraft.

J. R. Goldthwaite, Jr., Atlanta, Ga., Benjamin Wyle, New York City, for Union.

George Anderson, Rome, Ga., for Local 804.

Warren Woods, Washington, D. C., for United Papermakers, etc.

Bobby Lee Cook, A. Cecil Palmour, Cook & Palmour, Summerville, Ga., for Local 654.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

In this appeal we recognize the right of members of an all-black local union to protective transitional arrangements when their local is merged with a formerly all-white local, but we hold that such measures are inappropriate in this case.

For many years, International Brotherhood of Pulp, Sulphite, and Paper Mill Workers, AFL–CIO maintained segregated locals at the Krannert Division paper mill of the Georgia Kraft Company in Rome, Georgia.[1] Local 804, with approximately 190 members at the time of the commencement of this suit, was all-white; Local 805, with approximately 80 members, was all-black. During 1969, negotiating teams from the two locals, faced with the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e et seq., began working toward merger of the locals. The teams representing the two locals agreed on the terms of a merger only to have the agreement rejected by the members of the two locals.

On March 10, 1970, the Equal Employment Opportunity Commission found reasonable cause to believe that the maintenance of the segregated locals violated Title VII, and merger talks began once again. The negotiating teams reached agreement in May of 1970. The agreement provided for merger of the two locals on June 1, 1970, under the following terms:

The newly combined locals will operate under Local 804's present by-laws except for the following stipulations:

1. Members of Local 805 will select one of their members to fill the newly created office of 1st Vice-President for the remainder of 1970.

2. The outgoing 1st Vice-President will be appointed to the Local's Executive Board for the year 1971.

3. The Woodyard and Service Crew will have the right to select their Shop Stewards for their Department. The President of the Local shall have the right to appoint any additional Shop Stewards he deems necessary.

Although the members of Local 804 ratified the merger agreement, the members of Local 805 rejected it.

On August 28, 1970, the President of the International notified the two locals that merger would be accomplished by action of the International because the locals had been unable to agree on the terms of a merger. The International proposed to revoke Local 805's charter and to assign its membership, contract rights, and property to Local 804. Georgia Kraft was notified that this merger would become effective on October 1, 1970, and the Local 804 was to receive the dues check-offs for all former members of Local 805 as the new bargaining representative of the black members.

Counsel for Local 805 wrote a letter to officials of the International demanding

---

1. The Krannert Division of Georgia Kraft Company has been the subject of extensive equal employment litigation. For the background of the company and this litigation, see Long v. Georgia Kraft Co., N.D. Ga.1970, 328 F.Supp. 681, rev'd, 5 Cir. 1971, 450 F.2d 557. The instant appeal arises out of a motion for further relief in the original Title VII suit against the company and the unions. The district court's opinion in the instant matter is reported at 328 F.Supp. 695.

certain concessions in return for Local 805's approval of the merger.[2] When his requests were not granted by the International, the members of Local 805 sought and were granted a temporary injunction stopping the merger. The members of Local 805 asked the district court to impose certain terms and conditions on the merger including: 1) the creation of a new office and the filling of that and other merged-Local 804 offices with former Local 805 members for an interim period, 2) interim representation of former Local 805 members on existing Local 804 committees, 3) the right of predominately black woodyard and service crews to select their own shop stewards (shop stewards are usually appointed by the Local President), and 4) insulation of the members and funds of former-Local 805 from any liability for any award of attorney's fees.[3]

The district court denied the requests for protective transitional measures. 328 F.Supp. 681, 695. The motion for injunctive relief, however, was granted to the extent that Local 804 was forbidden, after merger, from using the funds of Local 805 to pay attorney's fees assessed against Local 804 in the suit or to pay for costs and attorney's fees in-

curred by Local 804 in defending the suit. Local 804 was required to use funds on hand before the merger to satisfy the expenses. As to expenses in excess of amounts Local 804 had on hand prior to the merger, Local 804 was permitted to utilize funds collected through normal dues collection procedures from all members of the merged locals. During February 1971 the locals merged.

The black members of Local 805, appellants in this Court, ask us to reverse the decision of the district court and order the protective transitional measures. The appellants rely on two well recognized and frequently utilized doctrines in the equal employment area. First, Title VII, by its terms, allows the courts to order "such affirmative action as may be appropriate" to insure full compliance with the equal employment opportunity provisions. 42 U.S.C. § 2000e–5(g). Second, this Court has repeatedly held that when it is necessary to insure full compliance with Title VII a district court is "empowered to eliminate the present effects of past discrimination". Local 53 of Int'l Assoc. of Heat and Frost Insulators & Asbestos Workers v. Vogler, 5 Cir. 1968, 407 F.2d 1047, 1052–1053. See also Local 189,

---

2. 1. The post of First Vice President shall be created for the merged locals, to be filled by a member of 805 at the time of the merger and during the year 1971;

2. The post of Financial Secretary of the merged locals shall be filled by a member of former Local 805 during the year 1971;

3. The number of trustees of the merged locals shall be five, of whom two shall be members of Local 805 at the time of the merger and during 1971;

4. The membership of the By-Laws Committee of the merged locals shall be five, of whom two shall be members of Local 805, at the time of the merger and during 1971;

5. The membership of the negotiating committee representing the merger locals during the 1971 contract negotiations shall include no less than two members of former Local 805;

6. The Woodyard and Service Crews will have the right to select shop

stewards in their own departments. The President of the merged locals shall have the right to appoint additional shop stewards he deems necessary;

7. No liability for any award of attorney's fees or other award to the plaintiffs in Long v. Georgia Kraft, either in the district court or upon appeal, shall be assessed against the present members of Local 805 or paid out of any funds taken from the treasury of that Local;

8. The terms of the merger shall become effective upon approval of the same as a consent decree by Hon. Sidney C. Smith, United States District Judge, presiding in Long v. Georgia Kraft et al.

3. In the district court, the plaintiffs requested that the interim protective features be instituted for one year. In this Court, they urge us to institute the transitional arrangements for a minimum of two years.

United Papermakers & Paperworkers, A. F.L.–C.I.O., C.L.C. v. United States, 5 Cir. 1969, 416 F.2d 980; United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418; United States by Mitchell v. Hayes Int'l Corp., 5 Cir. 1969, 415 F.2d 1038; Quarles v. Philip Morris, Inc., E.D.Va.1968, 279 F.Supp. 505.[4]

This appeal presents the question of how to "eliminate the present effects of past discrimination" in the context of the merger of two formerly segregated local unions. The appellants point out that, because of the long history of segregation in the unions and in the company, blacks have been unable to make the personal contacts and gain the prestige and respect necessary to win election to union offices. These "present effects of past discrimination" will, they argue, prevent the black members of the merged union from assuming, even to a small extent, the leadership role they enjoyed in the segregated Local 805.

The appellants urge us to follow Judge Heebe's opinion in Hicks v. Crown Zellerbach Corp., E.D.La.1970, 310 F.Supp. 536. After finding that the maintenance of separate local unions for white and black employees at Crown Zellerbach's Bogalusa plant by the Int'l Brotherhood of Pulp, Sulphite, and Paper Mill Workers violated Title VII, Judge Heebe ordered immediate merger of the locals with "Negro participation in the leadership of [the] merged local union over a two-year transition period". 310 F.Supp. at 537. Specifically, in that case the court ordered 1) the

election by the members of the formerly all-black local of a General Vice-President, a Trustee, and ten other persons to serve as stewards and members of the Executive Board of the merged union,[5] 2) an increase in the membership of the Executive Board from 83 to 95 with the twelve additional places to be filled by members of the all-black local, 3) full participation by the new officers in the supervision of the union, the negotiating committee, and the grievance committee during the transition period, and 4) representation of the formerly all-black local on all committees and delegations.

In general terms this Court has also addressed itself to this problem. In United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, the Court was faced with two segregated local unions. We held:

We conclude that the District Court erred in refusing to hold that the failure to consolidate the locals violates section 703(c) of the Act, 42 U.S.C.A. § 2000e–2(c). See United States v. Sheet Metal Workers [etc.] Local [Union No.] 36 [8 Cir. 1969] 416 F.2d [123] at 127–129; Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Volger [5 Cir. 1969] 407 F.2d [1047] at 1051–1055; United States v. International Longshoremen's Association, D.Md.1970, 319 F.Supp. 737, 741–742; Hicks v. Crown Zellerbach Corp., E.D.La.1970, 310 F.Supp. 536; United States [by Clark] v. Local 189, United Papermakers & Paperworkers, E.D.

---

4. With respect to discriminatory seniority sytems, we have utilized the "rightful place" theory.

 A *"rightful place"* theory stands bebetween a complete purge of "but for" effects [and] maintenance of the status quo. The Act shall be construed to prohibit the *future awarding* of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This

solution accords with the purpose and history of the legislation.

Local 189, United Papermakers & Paperworkers A.F.L.–C.I.O., C.L.C. v. United States, 5 Cir. 1969, 416 F.2d 980, 988. See generally Note, "Title VII, Seniority Discrimination, and the Incumbent Negro," 80 Harv.L.Rev. 1260 (1967); Comment, "Title VII of the Civil Rights Acts of 1964 and Minority Group Entry Into the Building Trade Unions," 37 U.Chi.L.Rev. 328 (1970).

5. All of these positions were specially created for the transition period and were to cease to exist after two years.

La.1969, 301 F.Supp. 906, 919, *aff'd* [Local 189, United Papermakers and Paperworkers, A.F.L.–C.I.O., C.L.C. v. United States by Mitchell] 5 Cir., 416 F.2d 980.

We implicitly recognized the appropriateness of transitional relief measures when we remanded the case to the district court stating:

> The District Court shall order consolidation of the BRAC and BMWE locals. *The court shall prescribe a reasonable consolidation procedure and provide for the equitable representation of all Union members during and after any necessary transition period.* (Emphasis supplied)

In analogous situations outside of the employment area, courts have ordered transitional protective measures. For example, in Lee v. Macon County, M.D. Ala.1968, 283 F.Supp. 194, a three-judge district court ordered merger of two segregated athletic associations

> For the purpose of assisting and guiding the parties, it is appropriate to observe that the planned merger of the Alabama High School Athletic Association and the Alabama Interscholastic Athletic Association should provide for a desegregated administrative staff and if, as has been suggested to the Court, the Alabama Interscholastic Athletic Association is abolished through this merger, the present Executive Director of the Alabama Interscholastic Athletic Association, or someone designated by that association, should become an executive officer of the Alabama High School Athletic Association. The Board of Control should be composed of both whites and Negroes in a ratio roughly in proportion to the number of schools in

> each of the associations. As a suggestion, the eight members of the Board of Control for the Alabama High School Athletic Association could continue to be members of the Board of Control of the merged association. However, the Board of Control shall be enlarged so there could be (and should be) a minimum of four Negroes on the Board of Control, making a total of twelve members on the merged association's Board of Control.

283 F.Supp. at 198–199.

 Because we recognize that transitional protective measures are a useful tool in the employment area we felt that it was necessary to discuss the subject, although we hold that such measures are inappropriate in the instant case. First, almost a year has passed since the merger of the segregated locals. During that time, the transition from two segregated locals to a fully integrated local has taken place. We are informed that Local 804 has held its election of officers. At that election, a black, former member of Local 805 was elected to one of the seven union offices.[6] In addition, the nine-member Negotiating Committee charged with negotiating the collective bargaining agreement with the employer on behalf of employees represented by Local 804, has three black members. Also, of the seventeen shop stewards appointed by the President of the Local, seven are black, former members of Local 805.[7] In short, blacks have now attained the leadership role which over a year ago they sought through court-ordered transitional measures. The use of protective measures is addressed to the sound discretion of a court of equity. Before requiring a district court to order such re-

6. Local 804 has approximately 270 members; about 80 of those members are black. At the election, held in December 1971, only about seventy-five members of the Local voted; of these, only about a dozen were black. Only one black candidate was nominated by the membership, although anyone could be nominated. This black candidate was nominated by a white man and was elected. A black candidate ran for President on a write-in basis and was defeated.

7. The Shop Committee is made up of the officers and the shop stewards. This 24-member committee (7 officers and 17 stewards) has 8 black members (1 officer and 7 stewards).

lief, we must be convinced that the need for equitable relief still exists. In the case at bar, the transition has taken place. The need which once existed for transitional measures has dissipated.

Second, it must be remembered that this merger was not a court-ordered merger. The locals merged, admittedly because of the requirements of federal law, as a result of action by the International. It was, in fact, the refusal of Local 805 to ratify the terms of merger agreed upon by the negotiating teams which forced the International to intervene. This voluntary merger, rather than violating Title VII as the appellants appear to contend, brought the union into compliance with federal law. Protective transitional measures have been utilized only in the context of a court-ordered merger. This is not to say that their use is confined to such situations nor that segregated locals can escape the imposition of protective measures by effectuating a "voluntary" merger just prior to a court order. We feel, rather, that the voluntary nature of the merger in this case is an important factor to consider, along with the time lapse, in determining the need for protective transitional measures.

Although, because transition has been accomplished and the locals have voluntarily merged, we decline to order protective measures in this case, we wish to carefully note what we are *not* deciding. We do not, by our decision, imply that a district court may not, in the proper case, order protective transitional measures; nor do we imply that the case at bar, prior to transition, would not have been a proper case. Finally, we do not decide whether a district court, faced with a merger of two segregated bodies dictated by federal law, might not, in fact, be *required* to institute protective measures.

■ The appellants object to the district court's handling of the attorney's fees issue. They point out that, under the court's order, the "victors" will be forced to "pay for their victory" in two respects. First, the funds of former-Local 804, which will be reduced by the expense of this litigation, are to be combined with the funds of former Local 805. Thus, the members of Local 805 will indirectly bear the cost of the litigation in that the merged treasury will be reduced. Any assessments for future expenditures, necessitated by the fact that the funds of the merged local are insufficient, will be greater than they would have been had the funds of the combined local not been depleted by litigation expenses. Second, the district court's order permits additional assessments upon the total membership of the combined Local in the event that the funds of segregated Local 804 are insufficient to cover litigation expenses. This would constitute, they argue, a direct assessment upon the appellants for the costs of the suit. The appellants ask that the *cost of this litigation be paid by* the International and by a special assessment of the members of the segregated Local 804.

In enacting Title VII, Congress, cognizant of the importance of private suits under the Act, provided statutory authorization for the discretionary awarding of attorney's fees.

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C. § 2000e–5(k). In addition, the courts have recognized the importance of private enforcement of civil rights legislation and have frequently awarded attorney's fees to successful litigants with or without statutory authorization. *See* Clark v. American Marine Corp., 5 Cir. 1971, 437 F.2d 959; Lee v. Southern Home Sites Corp., 5 Cir. 1971, 444 F.2d 143; Newman v. Piggie Park Enterprises, 1968, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263; Lea v. Cone Mills

Corp., 4 Cir. 1971, 438 F.2d 86; Parham v. Southwestern Bell Telephone Co., 8 Cir. 1970, 433 F.2d 421. See also Griggs v. Duke Power Co., 1971, 401 U. S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158; Jenkins v. United Gas Corp., 5 Cir. 1968, 400 F.2d 28; Miller v. International Paper Co., 5 Cir. 1969, 408 F.2d 283. See generally Mills v. Electric Auto-Lite Co., 1970, 396 U.S. 375, 90 S.Ct. 616, 24 L. Ed.2d 593; J. I. Case Co. v. Borak, 1964, 377 U.S. 426, 84 S.Ct. 1555, 12 L. Ed.2d 423; Comment, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U.Chi.L.Rev. 316 (1971). Through the awarding of attorney's fees, the courts have sought to encourage private suits and, thereby, effectuate the purposes of the legislation.

In the case at bar, we feel that the district court has properly accommodated the competing interests and goals in its decision on attorney's fees. It must be remembered that the appellants were not the "prevailing party" as that term is used in Title VII. Although the locals were merged, the merger occurred without direct judicial intervention and was not court-ordered. The merger was brought about by the action of the International, the very party against whom the appellants seek to assess attorney's fees. In fact, the members of segregated Local 804 approved the plan for merger negotiated by representatives of the two locals while the members of Local 805 rejected the plan. In this situation, it seems unfair to tax the International or the members of segregated Local 804 for the litigation expenses. On the other hand, given the Congressional and judicial policy of encouraging private enforcement of Title VII, the members of Local 805 should not be forced to bear the burden of the litigation expenses.

We approve the order of the district court as it relates to attorney's fees. The court balanced the interests and found a fair solution to the problem. The members of Local 805 have indirectly brought about merger of the segregated locals; the International and the members of segregated Local 804 are in compliance with federal law. The members of Local 805 will not be required to bear the entire cost of this litigation; the International and the members of segregated Local 804 will not be punished for voluntary compliance with federal law.

Affirmed.