Vincent Leonard SMITH et al.,
Plaintiffs-Appellees,

v.

The YOUNG MEN'S CHRISTIAN ASSO-
CIATION OF MONTGOMERY, INC.,
et al., Defendants-Appellants.

No. 71–1188.

United States Court of Appeals,
Fifth Circuit.

June 14, 1972.

Oakley Melton, Jr., Charles A. Stakely, Jr., Montgomery, Ala., Joseph D. Phelps, Asst. City Atty., Montgomery, Ala. (amicus curiae City of Montgomery, Ala.), for defendants-appellants.

Morris Dees, Jr., Joseph Levin, Jr., Montgomery, Ala., Levin & Dees, Fred D. Gray, Gray, Seay & Langford, Montgomery, Ala., for plaintiffs-appellees.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

We review on appeal a finding by the district court (Chief Judge Frank M. Johnson, Jr.) that the Young Men's Christian Association of Montgomery, Inc. (YMCA) had engaged in a pattern and practice of racial discrimination by operating segregated branches and by excluding Negroes from certain activities. The lower court held that the YMCA had violated the rights of appellees (plaintiffs below) and the rights of the class they represent, members of the Negro race, under the Equal Protection Clause of Amendment XIV to the Constitution as well as their statutory rights under the Civil Rights Act of 1866 (Title 42 U.S.C., §§ 1981, 1983) and the Civil Rights Act of 1964 (Title 42 U.S.C. § 2000a et seq.), enjoined further discriminatory practices by the YMCA, and ordered affirmative relief.[1] We modify slightly the relief granted, and affirm.

## I. THE FACTUAL SETTING

### The Organization of the Montgomery YMCA

The Montgomery YMCA is a nonprofit, tax-exempt organization incorporated under the laws of the State of Alabama. It offers a variety of recreational, spiritual and educational programs and activities in and around the City of Montgomery. The YMCA presently operates five branches in the greater Montgomery area—Central, South, East, Cleveland Avenue, and Prattville[2]—and had a total membership at the time of institution of this suit, June 1969, of approximately 18,000. The YMCA also operates a Camp Branch, which includes the two YMCA camps, Camp Belser and Camp Rotary. Each branch (excluding the Camp Branch) provides members with numerous recreational activities, such as swimming, scuba diving, table tennis, basketball, tennis, et cetera. The Camp Branch activities include swimming, boating, waterskiing, archery, and arts and crafts. In addition, the YMCA's recreational facilities include five gymnasiums, a health club, and eight swimming pools. Twenty percent of the YMCA's annual income comes from the Montgomery United Appeal Fund. By state statute it is exempt from taxes of any kind: state, county, municipal, licenses, fees or charges of any kind. Code of Alabama, Title 51, Section 12 (1957). Its physical assets are valued at almost $2,000,000. The YMCA operates extensive programs in the City of Montgomery and provides recreational programs for the general public. For example, over 2,400 young people participated each day in 1968 in various YMCA programs. In addition, in 1968 approximately 3,500 young people swam

---

1. The lower court's opinion is reported at 316 F.Supp. 899 (M.D.Ala.1970).

2. The Prattville Branch was dismissed from the case below by agreement of counsel, and thus is not before us on this appeal.

daily in the eight YMCA pools, the only pools open to the public in Montgomery. The YMCA operates numerous large scale programs open to the nonmember general public. These include football, Hi-Y, Tri Hi-Y and others.

The YMCA is operated and controlled by an all-white city-wide Board of Directors. Of approximately 18,000 YMCA members at the time suit was brought only 285 were eligible to vote for the Board of Directors. These "voting members" were originally selected by the Board of Directors. A voting membership committee from the board is appointed annually by the YMCA President to nominate new "voting members", who are then voted on by the then existing "voting members". The "voting members" in turn annually elect the new Board of Directors. Thus the entire YMCA organization is controlled by the board and the "voting members". Each branch of the YMCA is run by a Board of Managers appointed by the President of the YMCA with the approval of the Board of Directors.

Membership is open to the general public, the only qualifications being that the applicant be of "good moral character", in sympathy with the aims and purposes of the organization, and a citizen of Montgomery. The only other requirements for membership are the filing of an application form and the payment of annual dues. The YMCA offers eight different types of membership, ranging in cost from $15.00 to $125.00. Except for the "voting members", membership carries no voting rights. The application form asks only for the name, home address and phone number, sex, business address and phone number of the applicant; no other pertinent information such as personal or credit references is requested on the form. Applicants are rarely interviewed, and usually no investigation is made upon the receipt of an application form.

Neither the constitution nor the bylaws of the association limits the number of members, and almost all who apply are accepted for membership. In addition, no rules or regulations govern or define the rights and responsibilities of the members vis-a-vis the organization. For example the bylaws do not authorize the YMCA to discipline or expel its members. Members own no shares and have no property interest in the corporation; title to all the facilities is in the name of the YMCA. The general membership never meets together as an official group and never votes on any of the organization's policy decisions.

The Montgomery YMCA is an affiliate of the National Association of YMCAs, and honors membership cards from other associations. Out-of-state travelers use the facilities of the Montgomery YMCA, and pay special dues. There are no lodging facilities or dormitory space in any of the YMCA's buildings. No meal service, cafeterias, cafes, or restaurants are operated in the YMCA's buildings, although it operates some snack bars. Much of the recreational equipment used by the Montgomery YMCA is manufactured outside the State of Alabama.

*"State Action" and the 1958 Accord*

The Montgomery YMCA has a virtual monopoly on many of the recreational activities it offers, resulting largely from a cooperative agreement between the City of Montgomery and the YMCA in 1958. At that time, a "Montgomery Park and Recreation Department—YMCA Co-ordination Committee" was established to co-ordinate the facilities and programs of the YMCA with those of the city "in order to eliminate any conflict or duplication of efforts".

The historical background of the establishment of the cooperative agreement is revealing. On June 4, 1957, the City of Montgomery passed an ordinance requiring segregation in all public recreational facilities. On December 22, 1958, eight Negro plaintiffs filed a class action in the court below, asking that the ordinance and the city's policy and

practice of operating segregated recreational parks be declared unconstitutional.[3] Immediately upon being faced with suit the City Recreation Department Board of Commissioners by a resolution closed all of the city's recreational parks, athletic fields, swimming facilities, and playgrounds to all persons. The resolution was made effective January 1, 1959. On September 9, 1959, the district court held the ordinance and the policy and practice of the city in operating segregated parks to be unconstitutional and enjoined the defendant Board of Commissioners from enforcing the ordinance and from operating the municipal parks, when and if they were reopened, on a segregated basis. Gilmore v. City of Montgomery, M.D.Ala.1959, 176 F.Supp. 776, modified to direct retention of jurisdiction, and as modified, affirmed, 5 Cir.1960, 277 F.2d 364.

During this period the city and the YMCA decided to co-ordinate their efforts. Negotiations apparently began in the Spring of 1958. A special committee composed of Board and key staff members of the YMCA and the City Park and Recreation Department was established to study the recreational services offered by each organization.[4] The Montgomery Park and Recreation Board is, by state statute, given responsibility "for the direction, supervision, and promotion of such recreational programs as will contribute to the general welfare of the residents" of Montgomery. Ala.Code, Appendix, Pt. II, Art. 35A, § 1317(51) (1969).

The "Co-ordination Committee" proposed a two-part plan which was adopted by the city and the YMCA on November 13, 1958. First, the Recreation Department and the YMCA were to co-ordinate their various athletic programs so that both agencies would not be offering similar programs for the same age group. The YMCA, for example, was to supervise most of the athletic programs for all the elementary school children in the city, while the Recreation Department was to offer the same programs for the city's junior high school students. Since the city did not own or operate any swimming pools, the YMCA was to administer the city's entire swimming program. Second, the YMCA branches were to co-ordinate their club programs and informal education classes with those of the City Community Centers in their neighborhood areas. Whenever a YMCA branch and a community center were situated in the same school district, a member of the branch YMCA Board of Managers was to meet on a regular basis with a member of the Community Center Council to insure co-ordination of efforts. This plan, which was reviewed by the committee in 1959, and revised and expanded in 1965,[5] is still in effect today.[6]

The recommendations of this committee have had a substantial impact on the number and types of programs offered by the Montgomery YMCA. The YMCA offers no programs which either duplicate or conflict with those given by the Recreation Department.[7] As a re-

---

3. Prior to filing suit, the plaintiffs asked the city Board of Commissioners to repeal the ordinance and to permit them the use of all the city's parks. This request was denied by the city commissioners on September 17, 1958, the commissioners then stating "The Commission will not operate integrated parks".

4. The President of the YMCA, in a letter to the Mayor of Montgomery, suggested "that we do not include the Negro staff members or Board members". As a result, the only branch not represented on the committee was the Cleveland Avenue Branch.

5. Blacks were excluded from the committee in 1965 as well. See Note 4, supra.

6. The committee is comprised of three members of the Recreation Department Board and three members of the YMCA Board of Directors, with the Mayor, Recreation Superintendent and the General Secretary of the YMCA serving as ex officio members.

7. The YMCA, for example, conducts football, basketball and track programs for all of the city's elementary school children, but does not conduct any of these programs for the city's junior high students. The Recreation Department is re-

sult of this cooperative agreement, the YMCA has been the recipient of numerous benefits from the city. To illustrate, the YMCA is given free use of the city's parks, playgrounds, and lighting equipment for its various athletic programs; the city water works furnishes the YMCA with free water for its swimming pools; and the YMCA is permitted to recruit for its Camp Belser program and for other activities in the city's public schools. The YMCA has prospered substantially from its cooperative effort with the city. In 1957, the Montgomery YMCA operated one small branch in downtown Montgomery with less than 1,000 members. By 1960, two years after the "Co-ordination Committee" had been created, the YMCA operated five branches with five swimming pools. By 1969, when this suit was instituted, the YMCA operated six branches with eight swimming pools and has approximately 18,000 members.

The desire of the city to have the YMCA assist it in providing mass recreation to the residents of Montgomery was manifested in other ways. In 1961 the city Board of Commissioners passed an ordinance which authorized the city to sell the Perry Street Recreation Park to the YMCA for $18,000. The city reserved the right, however, to repurchase the land for the original sales price if, after three years time, the YMCA failed to construct upon the land, at a cost of at least $100,000, a facility to be used for "athletic, health, recreational and religious" purposes. The YMCA's Central Branch (a segregated branch) was built on this site within the three year period, and the option to repurchase was never exercised. Since the property was required to be used for the same purpose after the sale as before the YMCA simply exchanged places with the city as provider of recreation for the neighborhood.

## II. RACIAL DISCRIMINATION BY THE MONTGOMERY YMCA

Of the four YMCA branches located within the city of Montgomery, three are totally segregated by race. The South and East branches, serving predominately white neighborhoods, have between them 8,000 members, none of whom is a Negro. The Central branch, serving an extensively racially-mixed section of the city, also has an all-white membership. The South, East, and Central branches have all white staffs and Boards of Managers. The fourth branch, Cleveland Avenue, serves a predominately Negro area. It has approximately 2,000 members, nearly all Negroes. The Camp Branch, operating Camp Belser and Camp Rotary in summer, also had an all-white membership.[8] When this suit was filed neither Camp Belser nor Camp Rotary had ever had a Negro member. There had never been a Negro on the YMCA's Board of Directors.

Since most of the activities offered by a particular branch are available only to its own members, the overwhelming majority of activities offered by the YMCA are totally segregated by race. Thus, the swimming programs at the South, East, Central and Prattville branches are all-white, while the swimming program at the Cleveland branch is all-black.[9] Even those programs which are publicized as being open to the general membership of the YMCA are in fact rarely integrated. The Alabama Youth Legislature purported to be open to all Hi-Y members, had its first Negro participant in 1969, even though the Cleveland Avenue branch has had an active Hi-Y program for a number of years. In addition, the YMCA programs ostensibly open to the general public are segregated. For example, the YMCA, under its agreement with the city, operates

sponsible for administering the latter programs.

8. The Prattville branch, dismissed from this suit, also has an all-white membership of 3000.

9. There is no other swimming program open to the public in Montgomery.

a football program for grammar school children at its South, East and Cleveland Avenue branches. This program is available to all of the city's elementary school children, and membership in the YMCA is not required. At the time of this suit, however, only two or three blacks participated in the leagues at the East and South branches, while only a handful of whites played in the Cleveland Avenue leagues. The football season culminates each year with the playing of two bowl games, both sponsored by the YMCA. One game is played at Crampton Bowl, a municipal stadium donated by the city, between the league champions of the East and South branches. The teams in the other bowl game, played at the football stadium of Alabama State University, a Negro school, are from the Cleveland Avenue branch.

The YMCA's segregated branches and programs are a result of an assignment plan established several years ago by which every school in the city of Montgomery was assigned to one of the four YMCA branches, supposedly the branch nearest the school. Thus a student seeking YMCA membership was supposed to join the branch to which his school is assigned. The purported reason for the plan was to assist the individual branches in co-ordinating their athletic programs with those of the city's schools. As the plan now operates, however, each predominately white school in the city is assigned to one of the three all-white branches even though the school may be closer geographically to the Cleveland Avenue branch. Every predominately Negro school is, regardless of its location, assigned to the Cleveland Avenue branch. Furthermore, even those blacks who attend predominately white schools are permitted to join only the Cleveland Avenue YMCA branch.

The YMCA has operated Camp Belser on a similar all-white basis. The director of the program recruits only at predominately white schools. While the white branches post notices and send their members brochures publicizing the program, no information about the camp is given to the Cleveland Avenue branch or sent to its members.[10]

### III. THE CAUSE OF ACTION BELOW

On June 3, 1969, the two minor Negro male plaintiffs accompanied by their mothers and two other persons [11] went to the Central branch of the Montgomery YMCA to apply for membership in Camp Belser, the YMCA's summer day camp. Appellant Chandler, the Executive Director of the YMCA, refused to accept the completed applications, stating that he had no authority to accept applications for the camp from Negroes and that he would have to refer the matter to the YMCA's Board of Directors. Chandler told the plaintiffs that they would be notified within ten days of the Board's decision.

Eight days later, on June 11, the plaintiffs filed a class action below, seeking declaratory and injunctive relief under the Fourteenth Amendment Equal Protection Clause, under the Civil Rights Act of 1866, Title 42, U.S.C., Sections 1981, 1983, and the Civil Rights Act of 1964, Title 42, U.S.C., Section 2000a et seq. The defendants were the YMCA, its Executive Director and its Board. The jurisdiction of the district court was invoked pursuant to Title 28, U.S.C., Section 1343(3) and (4). The plaintiffs alleged in their complaint that they were denied membership in the YMCA's summer day camp program solely because they were Negroes. They further contended that: (1) the YMCA,

10. The YMCA Board of Directors has, for the past several years, seriously considered the possibility of either procuring funds to build a Negro camp to be operated by the Cleveland Avenue branch, or setting aside a week at Camp Belser each summer for the exclusive use of the members of the Cleveland Avenue branch.

11. Mr. Schutz, a representative of the National Democratic Party of Alabama, and Mrs. Baskin, a representative of the Alabama Council on Human Relations.

acting through its officers and employees, had engaged in and continued to engage in a pattern and practice of racial discrimination by fostering and maintaining segregated branches and by excluding Negroes from many of the association's recreational and educational activities; and (2) the YMCA's discriminatory conduct violated the constitution and laws of the United States. The plaintiffs sought a preliminary and permanent injunction prohibiting the YMCA from operating any of its programs in a racially discriminatory manner and ordering the YMCA to take whatever affirmative action was necessary to remedy the effects of its past discrimination.

On June 21, ten days later, Chandler notified the plaintiffs by registered mail that they had been accepted as members in Camp Belser. The plaintiffs did not thereafter attend the camp, however. On September 30, 1969, a hearing was held by the court below on plaintiffs' motion for preliminary and permanent injunctive relief. The case was submitted for final hearing upon this motion, the YMCA response, the pleadings, depositions, the oral testimony of witnesses before the court, in two days of testimony, numerous evidentiary exhibits, and the briefs and arguments of the parties.

Chief Judge Johnson, in his opinion of July 20, 1970, concluded that:

(1) the YMCA's granting of membership in Camp Belser subsequent to the instigation of the suit did not render the case moot; in the alternative, even if the plaintiffs were no longer entitled to personal relief, the action should continue for the benefit of other members of the class. The suit was recognized as a bona fide class action under Rule 23, F.R.Civ.P.

(2) the segregated conditions at Camp Belser and the other YMCA branches resulted primarily from the machinations and contrivances of the YMCA rather than from de facto or adventitious segregation.

(3) it was clear from an analysis of the historical context which prompted the establishment of the cooperative agreement between the YMCA and the city that its purpose was to circumvent the lower court's earlier desegregation ruling in the area of public recreation; the effect of this agreement was to perpetuate segregated recreational facilities and programs in the city of Montgomery; and the city's primary purpose in co-ordinating its efforts with those of the YMCA was to encourage and assist the YMCA in accomplishing what the city is constitutionally forbidden to do.

(4) the co-ordinated effort between the Recreation Department and the YMCA directly involved the city in the management and operation of the YMCA.

(5) the city's furnishing of parks, water, etc. to the YMCA at no cost placed the city in a position of interdependence with the YMCA.

(6) the YMCA, as a result of the cooperative agreement, has been performing a statutorily declared "public function"; the Montgomery Park and Recreation Board has, in effect, transferred some of its statutory authority and responsibility to the YMCA, thereby investing the YMCA with a municipal character; and therefore the YMCA has been serving as a municipal rather than a private agency in assisting the Park Board in providing recreational programs for the city.

(7) the YMCA's discriminatory conduct was so entwined with governmental policies and so impregnated with a governmental character as to be subject to the constitutional limitations to state action.

(8) the YMCA's discriminatory conduct denied the plaintiffs their Fourteenth Amendment rights to Equal Protection of the law; under the facts of this case the plaintiffs' showing of "state action" satisfies the

requirement under Title 42, U.S.C., Section 1983 that the YMCA's conduct be "under color of law".

(9) since the YMCA, in discriminating against the plaintiffs, acted as a quasi public agency and under "color of law", its refusal to extend the same contractual opportunities and rights to Negroes as it does to whites violates Title 42, U.S.C., Section 1981.

(10) applying the reasoning of Daniel v. Paul, 1969, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318, and Miller v. Amusement Enterprises, 5 Cir. 1968, 394 F.2d 342, to the facts of this case, the Montgomery YMCA is a "place of entertainment" within the meaning of Title 42, U.S.C., Section 2000a(b) (3).

(11) the YMCA's discriminatory conduct constitutes "state action" as defined in Title 42, U.S.C., Section 2000a(d), and, in the alternative, the YMCA presents "sources of entertainment which move in commerce" within the meaning of Title 42, U.S.C., Section 2000a(c) (3), thereby bringing the YMCA within the purview of the Public Accommodations Chapter of the Civil Rights Act of 1964.

(12) the YMCA's claim to private club status is without merit; the YMCA is too unselective in its membership policies to be a private club; the YMCA does not have any of the attributes of member-ownership or control associated with private clubs; private clubs do not derive twenty per cent of their annual revenue from public agencies or provide recreational programs for the general public; the YMCA is a public organization and thus not entitled to the private club exemption of the Public Accommodations Chapter of the Civil Rights Act of 1964, Title 42, U.S.C., Section 2000a(e).

The district court held that the Montgomery YMCA was in violation of the Civil Rights Act of 1866, Title 42, U.S. C., Sections 1981 and 1983, and the Civil Rights Act of 1964, Title 42, U.S.C., Section 2000a et seq.

*The Relief Granted*

Pursuant to the findings of fact and conclusions of law in its judgment below, the district court enjoined the Montgomery YMCA from:

1. Denying Negro applicants membership in any YMCA branch or excluding Negroes from any YMCA program or activity if such denial or exclusion is based upon race.

2. Constructing any new branches or extensions where the site selected may tend to perpetuate the past policies and practices of racial segregation.

3. Recruiting for its branches, programs or activities at predominately white schools unless recruiting of the same type and extent is conducted at predominately black schools.

4. Excluding Negroes from the city-wide Board of Directors and from any other governing bodies of the YMCA solely on the basis of race.

The order required the defendants to notify by letter, within thirty days from the date of the order, "each and every member that each YMCA branch and every YMCA program and activity is open to members of all races"; and to "include in every advertisement, and in every brochure, pamphlet or poster, publicizing the Montgomery YMCA or any of its activities a statement that such programs and activities are open to members of all races".

The court further ordered the defendants to submit to the court, within thirty days from the date of the order

a plan detailing how the YMCA proposes to eliminate its segregated memberships and activities. Such plan will include, but need not be limited to, the following:

(1) The reassignment of the various schools in the City of Montgomery to eliminate racially segregated branches. Such factors as the geo-

graphical location, the membership capacity, and the facilities of each branch should be considered.

(2) The reassignment of the approximately 1,000 "deserving" members without regard to race.[12]

(3) A proposal designed to insure representation of Negroes on the city-wide Board of Directors and other governing bodies of the YMCA.

Pursuant to the July 20, 1970 order the YMCA on August 18, 1970 filed its plan for the elimination of its segregated memberships and activities. The plaintiffs subsequently filed their response and objections to the YMCA plan. On September 29, 1970, the court found most of the YMCA plan constitu-

tionally unacceptable since it failed adequately to inform the residents of Montgomery of the YMCA's new nondiscriminatory policies, permitted the YMCA to continue certain programs and activities on a segregated basis, and afforded the Negro members of the YMCA only token representation on the city-wide Board of Directors. The court issued a detailed order, to be implemented immediately, covering publicity and recruitment, reassignment of schools, the Camp Branch, Deserving Youth Members, construction of new branches or facilities, and the city-wide Board of Directors and the Board's Executive Committee. The mandatory requirements of this order are reproduced verbatim in the margin.[13]

---

12. The YMCA conducts a program under which underprivileged youths are admitted to membership without payment of dues.

13. Accordingly, it is the ORDER, JUDGMENT and DECREE of this Court that the following modifications and amendments be implemented immediately;

 I. PUBLICITY AND RECRUITMENT

 1. It is the ORDER, JUDGMENT and DECREE of this Court that the YMCA include in every advertisement, radio and television announcement and news release, and in every brochure, pamphlet, newsletter, poster, or other promotional literature, publicizing the Montgomery YMCA or any of its programs and activities a statement that such programs and activities are open on a nondiscriminatory basis to members of all races.

 2. It is further ORDERED that the YMCA shall not recruit for its branches, programs, or activities at predominately white schools, city community centers, or "Y" branches unless recruiting of the same type and extent is conducted at predominately black schools, community centers and "Y" branches.

 II. REASSIGNMENT OF SCHOOLS

 1. It is the ORDER, JUDGMENT and DECREE of this Court that the YMCA assign for all purposes the following schools in the City of Montgomery to the following YMCA branches:

 CLEVELAND AVENUE

 *Elementary*: Bellinger Hill, Bellingrath, Billingslea, Booker Washington, Carver, Chilton, Daisy Lawrence, Davis, Fews, Goode Street, Loveless, Mac-

Millan, McIntyre, Maxwell AFB, Pendar Street, Southlawn
 *Junior High*: Baldwin, Booker Washington
 High: Sidney Lanier
 *High*: Sidney Lanier

 SOUTH
 *Elementary*: Bear, Crump, Dannelly, Floyd, Forest Avenue, Harrison, Hayneville, Johnson, Montgomery Academy, Queen of Mercy, St. James, St. Jude
 *Junior High*: Cloverdale, Hayneville
 *High*: Alabama State Div., Carver, Jeff Davis

 EAST
 *Elementary*: Alabama Christian, Capitol Heights, Chisholm, Dalraida, Flowers, Head, Highland Avenue, Highland Gardens, Madison Park, Morningview, Paterson, St. Bedes
 *Junior High*: Capitol Heights, Goodwyn, Houston Hills
 *High*: Robert E. Lee
 It is further ORDERED that:

 (1) The YMCA use this assignment list for all activities, commencing with the 1971 season for football, and effective immediately for its track leagues, cheerleading squads, Hi-Y and Tri-Hi-Y programs, and any other program or activity in which student-participants are assigned on the basis of the schools they attend.

 (2) The YMCA permit no team participating in its football and track programs to be comprised of players who attend schools assigned to different YMCA branches, except that the YMCA shall permit any student scheduled to play for a team in which his race is in the ma-

## IV. ISSUES AND ANSWERS

On appeal the YMCA raises in the main the contentions it urged below. Of the nine points raised by the YMCA, two have to do with procedural questions, three deal with the district court's findings and conclusions, and four attack as unwarranted the injunctive relief granted. We set out the questions raised, following the same order:

jority to choose to play for any team in which his race is in the minority.

III. CAMP BRANCH

It is the ORDER, JUDGMENT and DECREE of this Court that any and all recruiting and advertising for the YMCA summer camps be done in nondiscriminatory manner.

It is further ORDERED that:

(1) The YMCA send, commencing during April, 1971, and each April thereafter until further ordered, letters and brochures publicizing its summer camps to each member of the Cleveland Avenue branch.

(2) The YMCA provide pick-up stations for campers in the predominately Negro neighborhoods to the same extent and in the same manner as it has done in the predominately white areas.

IV. DESERVING YOUTH MEMBERS

It is the ORDER, JUDGMENT and DECREE of this Court that the YMCA consider all applications filed by deserving youth without regard to race.

It is further ORDERED that:

(1) The YMCA, upon awarding a deserving youth membership, permit such member to attend any branch he selects which has a deserving youth program.

(2) The YMCA notify by letter all deserving youth members that they may exercise their membership at any branch having a deserving youth program.

(3) The YMCA file with this Court, within six months from the date of this order, a list of deserving members whose memberships have been provided for out of the counsel fees plaintiffs' counsel waived in this proceeding.

V. CONSTRUCTION OF NEW BRANCHES OR FACILITIES

1. It is the ORDER, JUDGMENT and DECREE of this Court that the YMCA shall not construct any new branches, extensions, or facilities where the site selected may tend to perpetuate the past policies and practices of racial segregation.

(1) Procedure:

(a) whether the lower court erred in finding that the plaintiffs' cause of action was not moot, i. e., that the YMCA was involved in a "case or controversy" with the plaintiffs; and

(b) whether the court below erred in finding that the plaintiffs had standing to bring a class action

VI. CITY-WIDE BOARD OF DIRECTORS

1. It is the ORDER, JUDGMENT and DECREE of this Court that the defendants take appropriate action that will, not later than one year from the date of this order, achieve a ratio of black to white members on the City-wide Board of Directors that will approximate that of the Negro to white population in the City of Montgomery.

2. It is further ORDERED that the defendants take appropriate action that will, not later than 90 days from the date of this order, achieve a ratio of black to white members on the City-wide Board of Directors Executive Committee that will approximate that of the Negro to white population in the City of Montgomery.

This Court specifically retains jurisdiction in this case.

Done, this the 29th day of September, 1970.

FRANK M. JOHNSON, JR.
UNITED STATES
DISTRICT JUDGE
AMENDED ORDER
(Number and Title Omitted)
(Filed: October 2, 1970)

It is ORDERED that the order and judgment made and entered in this cause September 29, 1970, to the extent that said order directs that the YMCA assign certain schools to designated YMCA branches for YMCA activity purposes, be and the same is hereby amended by adding Loveless Junior High School, Carver Junior High School, McIntyre Junior High School and Bellingrath Junior High School to those schools assigned to the Cleveland Avenue Branch and Floyd Junior High School to those schools assigned to the South Branch.

Done, this the 2nd day of October, 1970.

FRANK M. JOHNSON, JR.
UNITED STATES
DISTRICT JUDGE

against the YMCA on behalf of other Negroes "similarly situated".

(2) Findings and Conclusions:

(a) whether the court below erred in finding that the YMCA was an "agency" of the city of Montgomery and that the YMCA's programs and activities constituted "state action", thereby subjecting the YMCA to the requirements of the Fourteenth Amendment under Title 42, U.S.C., § 1983;

(b) whether the court below erred in finding that the YMCA acted as a public agency and under color of law so as to violate the plaintiffs' rights under Title 42, U.S.C., § 1981; and

(c) whether the YMCA is a place of entertainment and thus a covered establishment under Title II of the Civil Rights Act of 1964, Title 42, U.S.C., § 2000a et seq.

(3) The Relief Ordered:

(a) whether the lower court erred in ordering the affirmative duties prescribed in its Orders to eliminate the segregated memberships and activities of the YMCA;

(b) whether the lower court erred in ordering specific school assignments of certain YMCA programs to specific YMCA branches;

(c) whether the lower court erred in fixing a racial ratio for the membership of the YMCA Board of Directors and Executive Committee; and

(d) whether the lower court erred in enjoining the YMCA in its publicity and promotion activities and in the construction of new branches and facilities.

We shall address ourselves to the questions as to procedure, the basis for decision below, and the relief granted in the same sequence.

*Procedure: Justiciability and Rule 23, F.R.Civ.P.*

The YMCA maintains that the acceptance of the minor plaintiffs for admission to Camp Belser after the filing of this suit rendered the case moot since there no longer existed a case or controversy, under Article III, Sec. 2, U.S. Constitution, between the plaintiffs and the YMCA, so that the plaintiffs no longer had standing to maintain this action after they were accepted to Camp Belser.

 Mootness is not so easily established. Voluntary cessation of the alleged illegal act or practice is not sufficient to indicate mootness for otherwise the defendant would be able to return to his allegedly illegal practice. See, e. g., Gray v. Sanders, 1962, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821; United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303. Subsequent remedial actions allegedly taken to obviate a cause of action strongly mitigate against a finding of mootness, particularly where the plaintiffs present a prima facie showing of racial discrimination. See, e. g., Jenkins v. United Gas Corp., 5 Cir. 1968, 400 F.2d 28; Cypress v. Newport News General and Nonsectarian Hospital Ass'n, 4 Cir. (en banc) 1965, 375 F.2d 648; Lankford v. Gelston, 4 Cir. 1965, 364 F.2d 197; United States v. Atkins, 5 Cir. 1963, 323 F.2d 733. In addition, in similar but not identical situations, we have held that cases are not mooted by eliminating the challenged activity, particularly where, as here, the plaintiffs seek to enjoin a whole pattern and practice of racial discrimination. See, e. g., Lewis v. Housing Authority of City of Talledega, Alabama, 5 Cir. 1968, 397 F.2d 178; Pullum v. Greene, 5 Cir. 1968, 396 F.2d 251; Singleton v. Board of Commissioners of State Institutions, 5 Cir. 1966, 356 F.2d 771.

 The YMCA asserts that the plaintiffs applied to Camp Belser for the sole purpose of integrating the camp, and that this purpose cannot create a case or controversy. Assuming arguendo the truth of this claim, the plaintiffs' standing is not thereby destroyed as the appellants assert. The Supreme Court

ruled in *Evers v. Dwyer*, 1958, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222, that such a purpose is sufficient to confer standing and does not detract from whether an actual case or controversy exists between the parties. *Evers* dealt with a plaintiff who boarded a bus for the sole purpose of instituting civil rights litigation.

The YMCA relies heavily on our decision in *Stout v. Young Men's Christian Ass'n of Bessemer, Ala.*, 5 Cir. 1968, 404 F.2d 687, as support for the argument as to lack of standing. Such reliance is unwarranted. In *Bessemer*, we held that the Bessemer, Alabama, YMCA was not exempt under the private club exception to the Public Accommodations Chapter of the Civil Rights Act of 1964, Title 42, U.S.C., § 2000a et seq., and that the Bessemer YMCA's refusal of lodging to Negroes was a violation of the act. But we also held that the plaintiffs there lacked standing to challenge the food serving policies of the Bessemer YMCA, since the YMCA only sold and served food to church or civic groups and no such organization with Negro members had been refused service. The Montgomery YMCA urges that *Bessemer* requires the rejection of the appellees' standing to sue, since the Montgomery YMCA has never refused membership to Negroes and here (belatedly) accepted the plaintiffs' applications for Camp Belser. This argument obviously lacks substance. It completely misconstrues the impact of *Bessemer*. The standing question in *Bessemer* was resolved because no evidentiary showing was made that the Bessemer YMCA had ever acted discriminatorily in serving or selling food. In the case at bar, to the contrary, ample evidence was introduced to demonstrate a long standing and persistent pattern and practice of racial discrimination throughout the Montgomery YMCA. At the time this suit was brought no black youth had ever attended the regular sessions at Camp Belser, and no attempt had ever been made by the Montgomery YMCA even to advise Negro members of the YMCA of the ex-istence of the camp program. The first blacks ever to apply to attend the day camp, the minor plaintiffs, were refused admission. Nor could the trial court ignore that the YMCA had consistently operated all its branches and all its programs on a racially segregated basis. Clearly the plaintiffs made out a prima facie case below of widespread racial discrimination by the Montgomery YMCA. The YMCA's subsequent admission of the two minor plaintiffs to Camp Belser did not suffice to remove their standing to bring this suit. It must be kept in mind that the attack here was on a broad front involving a whole pattern and practice of racial discrimination by the Montgomery YMCA over a considerable period of time.

Further the YMCA maintains that the plaintiffs could not bring a class action here under Rule 23, F.R. Civ.P. The YMCA argues that the acceptance prior to suit of the minor plaintiffs' applications to Camp Belser is fatal to the plaintiffs' bringing this cause as a class action since under Rule 23 a plaintiff who has been discriminated against is necessary as a named plaintiff in order to maintain a class action, which is to say that the minor plaintiffs here must first allege and prove that they have been deprived of their own civil rights before they may bring a class action representing others similarly mistreated. This is little more than a re-assertion of the lack of standing argument in a different guise. No attack is made by the YMCA as to whether the plaintiffs fail to meet other requirements of Rule 23. Since we find that an actual case or controversy existed between the minor plaintiffs and the YMCA, it is clear that the requirements of Rule 23 have been met. The lower court correctly permitted this cause to proceed as a class action. See, *Potts v. Flax*, 5 Cir. 1963, 313 F.2d 284, holding that the Ft. Worth school desegregation case was not mooted because the original minor plaintiffs no longer were seeking admission to the schools. Accord in a Title VII, Civil Rights Act of 1964 set-

ting, Johnson v. Georgia Highway Express, Inc., 5 Cir. 1969, 417 F.2d 1122, 1124.

## THE BASIS OF DECISION BELOW

*Violations of Secs. 1983 and 1981, Title 42 U.S.C.*

■■ Two elements must be proven to recover under Title 42, U.S.C., § 1983, (1) a deprivation of a constitutional right by the defendant, and (2) that the defendant acted under "color of law". Title 42, U.S.C., Sec. 1983; Adickes v. S. H. Kress & Co., 1970, 398 U.S. 144, 90 S. Ct. 1598, 26 L.Ed.2d 142. The district court correctly found that the Montgomery YMCA was so closely entwined with the City of Montgomery that it acted under "color of law" when it refused the plaintiffs' applications for Camp Belser as well as in its conduct of segregated branches and activities. The YMCA enjoyed tax-exempt status, it utilized city property, it conducted city programs, and it derived income from the city. Adams v. Miami Police Benevolent Ass'n, Inc., 5 Cir. 1972, 454 F.2d 1315. See additionally Adickes v. S. H. Kress & Co., supra, and Burton v. Wilmington Parking Authority, 1961, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. This finding is clearly supported by the record and is not "clearly erroneous". Rule 52(a), F. R.Civ.P.

The activities of the Montgomery YMCA fall under the proscription offered by the Supreme Court in Evans v. Newton, 1966, 382 U.S. 296, 299, 86 S. Ct. 486, 488, 15 L.Ed.2d 373, that "conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action". See further Burton v. Wilmington Parking Authority, supra, and its progeny in this circuit: Hammond v. University of Tampa, 5 Cir. 1965, 344 F.2d 951; Wimbish v. Pinellas County, 5 Cir. 1965, 342 F.2d 804; Hampton v. City of Jacksonville, 5 Cir. 1962, 304 F.2d 320.

■ The district court found also that the YMCA had engaged in and continued to engage in a pattern and practice of racial discrimination by operating segregated branches and activities from many of which Negroes were systematically excluded, in violation of plaintiffs' constitutional and statutory rights. The record demonstrates that this determination was also not "clearly erroneous", Rule 52(a), supra. Since both necessary elements of a Section 1983 violation, (a) the deprivation of 14th Amendment equal protection of rights (b) under color of law, were proven, the district court was on solid ground when it concluded that the Montgomery YMCA was in violation of Section 1983.

The district court also held that since the YMCA, in its discriminatory actions, had acted as a quasi-public agency and under "color of law", the YMCA was also in violation of Section 1981. In view of our holding that the plaintiffs made out a case under Section 1983, we deem it unnecessary to reach the question of claimed Section 1981 violation.

*Violation of Title II, the Public Accommodations Chapter of the Civil Rights Act of 1964*

■ The district court as a separate ground for relief found further that the racially discriminatory activities of the Montgomery YMCA violated Title II of the Civil Rights Act of 1964, Title 42, U.S.C., Section 2000a et seq.

Two elements are requisite to a determination that an establishment is coveerd by Section 2000a et seq.;

(1) that the esvablishment is a "place of public accommodation" as defined by Section 2000a(b); and

(2) either (1) that the operation of the establishment "affects" commerce, within the meaning of Section 2000a(c), or (2) that its discriminatory conduct is conducted under "color of law" or supported by state action, under Section 2000a(d).

Section 2000a(b) (3) defines as a place of public accommodation " . . .

648

any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment". Sitting en banc in Miller v. Amusement Enterprises, supra, we held that the phrase " . . . or other place of . . . entertainment" includes both "establishments which present shows, performances and exhibitions to a passive audience and those establishments which provide recreational or other activities for the amusements of its patrons". Id., 394 F.2d at 350. The Supreme Court, in Daniel v. Paul, supra, cited Miller with approval, and held that "place of entertainment" includes a public establishment where entertainment takes the form of direct participation in some sport or activity as well as to an establishment where patrons are entertained as spectators or listeners. The district court here, applying the reasoning of Daniel and Miller, determined that the Montgomery YMCA was a "place of entertainment" under Section 2000a(b) (3).

The YMCA argues on appeal that the Daniel and Miller cases are distinguishable from the case at bar, since both of these cases involved commercial activities operated for a profit. This is an impermissible and unjustified restriction of the holdings of these two cases. As the Supreme Court said in Daniel:

"In light of the overriding purpose of Title II 'to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public', . . . we agree with the en banc decision of the Court of Appeals for the Fifth Circuit in Miller v. Amusement Enterprises, Inc., . . . . that the statutory language 'place of entertainment' should be given full effect according to its generally accepted meaning and applied to recreational areas." (Emphasis added) Id. 395 U.S. 308, 89 S.Ct. at 1702, 23 L.Ed.2d 318.

The recreational activities presented by the Montgomery YMCA were open to the public generally, at least to the white segment thereof, and come under the broad definition of entertainment expounded in Miller and espoused in Daniel. That the Montgomery YMCA purports to be an eleemosynary organization warrants no different result. We refuse to allow racial discrimination which affects commerce or is under "color of law" simply because it is carried on by a nonprofit organization. See, e. g., Williams v. Rescue Fire Co., D.Md. 1966, 254 F.Supp. 556. The district court correctly decided that the Montgomery YMCA is a place of entertainment under Section 2000a(b) (3).

The YMCA also argues that it neither "affects commerce" nor operates under "color of law", nor is supported by state action. What we have already said amply indicates our view that the record supports the lower court's determination that the Montgomery YMCA has been conducting its programs both under "color of law" and supported by state action. Further, the record supports the conclusion that the YMCA "affects" commerce. See, e. g., Stout v. Bessemer, supra; Miller v. Amusement Enterprises, Inc., supra; Daniel v. Paul, supra.

The YMCA next argues that even if it meets the other requirements of Section 2000a et seq., it is an exempt organization under Section 2000a(e), which provides that private clubs or other establishments "not in fact open to the public" shall be exempt from the operation of the Public Accommodations Chapter of the Civil Rights Act of 1964. The Montgomery YMCA is open to the public, freely admits to membership without question almost all who apply, enjoys a substantial amount of revenue from the general public, operates as a quasi-public agency, and is neither owned nor governed by its members. For these reasons it totally fails to meet the standards required for private club exemption under Section 2000a(e). Stout v. Young Men's Christian Ass'n of Bessemer, Ala., supra. Also see, Daniel v. Paul, supra; Nesmith v. YMCA of Raleigh, 4 Cir. 1968, 397 F.2d 96.

The district court correctly held that the Montgomery YMCA is a covered "public accommodation" under Title 42, U.S.C., Section 2000a et seq., and thus in violation of Title II of the Civil Rights Act of 1964. This provided a separate and additional ground for the injunctive relief granted by that court's decree.

## The Injunctive Relief Granted by the District Court

Perhaps the YMCA's most vociferous complaint on this appeal has to do with the affirmative relief ordered by the court below. We are urged to hold that the lower court's order was too sweeping in reassigning the Montgomery schools, in requiring non-discriminatory publicity, and in ordering the YMCA to elect a specific percentage of Negroes to the city-wide Board of Directors and Executive Committee of the YMCA. The YMCA contends that these measures are not required by either the Constitution or by any federal statute, and further that the court's decree is unmanageable and unduly burdensome upon the YMCA. With one exception respecting the requirement of the decree that within one year there be achieved a black to white ratio in YMCA's Board of Directors and Executive Committee membership approximating the ratio of Negro to white population of Montgomery, we find no merit in these complaints as to the breadth of the decree. The requirements for fixed ratio Board membership must be eliminated.

As we have stated often before, federal courts have an affirmative duty to order broad remedial relief where necessary to correct the effects of a pattern and practice of racial discrimination. Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709; Adams v. Miami Police Benevolent Ass'n, Inc., supra; Local 53 of International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047; United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836. The district court here determined that affirmative remedial relief was necessary to correct the effects of the Montgomery YMCA's pattern and practice of racial discrimination. This appraisal was justified by the record.

A court of equity has unquestioned wide powers to provide effective means for enforcement of the congressional mandate of the Civil Rights Acts and to eradicate the effects of past discrimination. "The matter of devising an appropriate remedy for deprivation of constitutional rights is addressed to the sound discretion of the trial judge". Adams v. Miami Police Benevolent Ass'n, Inc., supra. Given the Montgomery YMCA's past pattern and practice of racial discrimination abundantly demonstrated on this record, we are not willing to brand as inappropriate or overbroad the affirmative relief ordered by the able and experienced district judge, fully acquainted with and sensitive to the local situation and its overtones and undertones, both blatant and subtle. Study of the district court's final detailed order (see Footnote 13, supra) as applied to the record before it convinces us that the affirmative relief ordered is neither unworkable nor unduly burdensome to the YMCA and the individual defendants.

We affirm the order of the court below, with one exception. We do not approve that portion of the district court's order which directs that a specific ratio of Negroes must be elected to the city-wide Board of Directors and the Executive Committee of the Montgomery YMCA. Taking a practical view, as we must in reviewing equitable relief, we are not persuaded that they are necessary.

We have not hesitated to hold in the past that the federal courts have a duty to ensure that blacks have an equal opportunity to be elected or appointed to public offices, school boards and union offices, and selected on draft boards and juries. Clay v. United States, 5 Cir. 1968, 397 F.2d 901, reversed on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22

L.Ed.2d 297 (1969), Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1. We have never held that blacks, or whites, or any particular persons may be guaranteed election to such positions or selection to serve as jurors. We have held that affirmative relief may provide for equitable representation during transitional periods, at least in Title VII cases. See Long v. Georgia Kraft Co., 5 Cir. 1972, 455 F.2d 331; United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418; see also Hicks v. Crown Zellerbach Corp., E.D.La.1970, 310 F.Supp. 536; Lee v. Macon County, M.D.Ala.1968, 283 F.Supp. 194. Since we hold that such relief is not necessary in this case we note these precedents as indicating current developments of the law in this Circuit without determining their applicability vel non to the question of racially proportionate representation on the YMCA Board of Directors and Executive Committee membership.

The other affirmative relief granted by the district judge appears adequate to solve the problem of past discriminatory practices by the YMCA. We note that 70 of the 285 "voting members" of the Montgomery YMCA were Negroes at the time this suit was filed. A real possibility exists of an opportunity for Negroes to be elected in some considerable numbers on their own to the Board of Directors. In this situation, we are not convinced that further affirmative relief is necessary or proper. We vacate that part of the district court's order, Note 13, supra, "VI. City-wide Board of Directors" fixing time limits for the election of a ratio of blacks to the city-wide Board of Directors and its Executive Committee to correspond with the racial population ratio of the city of Montgomery. In so modifying the relief granted, we emphasize that we specifically approve and leave in full force that portion of the district court's July 20, 1970 order enjoining the Montgomery YMCA from "excluding Negroes from the city-wide Board of Directors and from any other governing bodies of the YMCA solely on the basis of race". The dis-

trict court should retain jurisdiction for the purpose, if necessary, of granting further relief upon demonstrated need therefor after further adversary hearing, in addition to the purpose of extending the relief granted to other members of the minor plaintiffs' class.

## IV. CONCLUSION

We find no error in the district court's determination that the Montgomery YMCA was in violation of the Civil Rights Acts both Title 42, Section 1983 and Title 42, Section 2000a et seq. With the exception of the provisions regarding the YMCA Board of Directors and Executive Committee noted, we approve the injunctive relief, both prohibitory and mandatory, ordered by the trial court. Costs shall be taxed to the appellants.

Modified, and as modified, affirmed.