Jean SOLOMON and Ruby Rayford, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

The MIAMI WOMAN'S CLUB and the Florida Federation of Women's Clubs, Defendants.

Civ. No. 72–701.

United States District Court,
S. D. Florida,
Miami Division.

March 30, 1973.

42

Jon D. Caminez, Tallahassee, Fla., for plaintiffs.

L. S. Bonsteel of Smathers & Thompson, Miami, Fla., for The Miami Woman's Club.

Doris A. Dudney of Fowler, White, Gillen, Humkey, Kinney & Boggs, P. A., Tampa, Fla., for The Fla. Federation of Women's Clubs.

ROETTGER, District Judge.

This civil rights case presents the all-too familiar pattern of difficult cases made more difficult when both parties act as if the Holy Grail is a permanent possession in their own trophy case. Briefly stated, plaintiffs are black and contend their civil rights have been violated because the Miami Woman's Club would not admit them to membership and the Club insists it is a private organization.

## FINDINGS OF FACT

The facts generally have been stipulated to among the parties.

Plaintiffs, Jean Solomon and Ruby Rayford, are black residents of this judicial district. The Miami Woman's Club is a non-profit corporation consisting of women members residing in and around Miami. Both the Miami Woman's Club and the Florida Federation of

Women's Clubs, a state-wide organization to which the Miami Club belongs, are named as defendants in this suit.

On April 22, 1972, plaintiff Rayford sent a letter to defendant Miami Woman's Club at the Club's address at 737 North Bayshore Drive requesting a membership application.

Subsequently, by telephone, Mrs. Rayford requested an application blank from an employee of the Club, Mrs. Audrie Wheat, who told Mrs. Rayford she had no authority to give out application forms. When asked how an application form could be obtained, Mrs. Wheat told Mrs. Rayford that application blanks must be received from Club members. Not knowing the names of any members, Mrs. Rayford then asked for a membership list but was refused. After this conversation, Mrs. Rayford visited the Club on two different occasions but was unsuccessful in obtaining an application blank.

Plaintiff Solomon also telephoned the Club and spoke to Mrs. Wheat. Her request for an application blank was likewise refused. Mrs. Solomon visited the Club on two occasions but was not able to speak to anyone.

█ The Miami Woman's Club was organized in 1900[1] and became federated with the Florida Federation of Women's Clubs in 1903. The property on which the clubhouse sits is owned by the Club and the Club's business is managed by its officers and directors who are elected by the general membership. The Club neither seeks nor receives funds from the public and does not advertise for members. It does not have a license to purvey food or alcoholic beverages.

An applicant for membership in the Miami Woman's Club must be proposed by an active member and endorsed by two others. All three must have been members of the Club for at least two years and have known the applicant for that time. No member of the Club may propose or endorse more than two candidates a year.

The defendant Florida Federation was organized in 1898 and consists solely of women's clubs throughout the State of Florida. It does not receive applications from individuals. Approximately 32,000 members are in the Federation. It leases the land on which its headquarters are located from the City of Lakeland.

The Miami Woman's Club has engaged in various activities since its inception in 1900. For many years, the Club's primary function was to maintain a public library in Dade County but that function ceased when the city of Miami eventually developed its own library system.

The Miami Woman's Club has approximately four hundred members, an initial fee of $25.00 and annual dues of $15.00. No member of the Club receives compensation except reimbursement for some of the expenses incurred by its president in attending meetings of the General and Florida Federations.

At trial, Mrs. Burton, the president of the Miami Woman's Club, testified that the Club would not and could not accept a black person for membership since the articles of incorporation of the Federation limited membership to white women.

## CONCLUSIONS OF LAW

*Standing:*

█ The first question presented is whether plaintiffs have standing to challenge the admission policies of the Miami Woman's Club.

Defendant Club contends that since Mrs. Rayford testified that she had not presented a written application to the Club for membership, she therefore

1. The Court takes judicial notice that in 1900 Miami was not a sprawling metropolis but a town of 4955. It came into existence and held its first election only four years earlier; the "barefoot mailman" had only stopped his unique mailroute in the previous decade when Henry Flagler's railroad had opened South Florida for development by pushing southward to Miami in 1896.

lacked the standing necessary to litigate the membership policies of the Club. *See* Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

Completion of an application blank for membership is not indispensable to plaintiffs' standing under the facts of this case. The evidence showed that plaintiffs attempted several times to obtain forms but that each time they were unsuccessful. The fact that the person refusing plaintiffs was Mrs. Wheat, an employee, rather than a member of the Club, is immaterial in light of Mrs. Wheat's statement to Mrs. Rayford that application blanks could be obtained only from Club members and that a list of Club members was unavailable. After this statement, further effort on Mrs. Rayford's part would only have been pointless.

Obviously the court will not require plaintiffs to exhaust procedures which would be futile. If the court ruled otherwise, no plaintiff alleging a deprivation of civil liberties could ever obtain standing except with the full cooperation of the defendant.

■ In this vein, the policy behind the relief afforded under Title 42 U.S.C. § 1983 and Title 28 U.S.C. § 1343(3) is that requirements for standing are to be broadly construed. *See, e. g.*, Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1961). Under these circumstances, plaintiffs have comfortably cleared a standard of reasonableness for the standing requisite for judicial review.

*Merits:*

■ To state a claim under Title 42 U.S.C. § 1983 the elements which must be proven are deprivation of a constitutional right by defendants and the fact that defendants acted under color of law. Smith v. Y. M. C. A. of Montgomery, Inc., 462 F.2d 634, 647 (5th Cir. 1972).

(a) *Deprivation of Rights:*

■ Membership in a private organization may not be secured by suit under the Civil Rights Acts. Sims v. Order of Commercial Travelers of America, 343 F.Supp. 112 (D.C.Mass.1972). Specifically, Title 42 U.S.C. § 2000a provides that the prohibitions against discrimination or segregation in places of public accommodation shall not apply to a private club.

■ The burden of proof is on the Miami Woman's Club to prove its exempt status under section 2000a. Nesmith v. Y. M. C. A. of Raleigh, N. C., 397 F.2d 96, 101 (4th Cir. 1968).

■ Courts look at several factors to determine whether a club, in fact, is private or merely a subterfuge to evade the civil rights laws. Among these factors are whether the membership is limited or open-ended, whether the facilities are open to the public, existence of easily articulated admission standards, and whether its funds are derived from public or private sources. Stout v. Young Men's Christian Ass'n of Bessemer, Ala., 404 F.2d 687 (5th Cir. 1968); Nesmith v. Y. M. C. A. of Raleigh, N. C., *supra,* 397 F.2d at 102.

■ The Miami Woman's Club meets all of the foregoing standards required for the private club exemption. In addition, the evidence indicates it meets all of the tests of a private club set forth in Wright v. Cork Club, 315 F.Supp. 1143, 1153 (S.D.Tex.1970). The Club does not accept a new member unless she had been endorsed by an active member and endorsed by two others. This method may be a basis for excluding applicants but it does serve to provide the Club with a way to select or reject applications. Selectivity has often been said to be the essence of a private club and selection by recommendation serves to draw a line of demarcation between admitting the general public and only the select few.

The Miami Woman's Club is a nonprofit organization operated solely for the benefit and use of its members. Bell v. Kenwood Golf and Country Club, Inc., 312 F.Supp. 753 (D.C.Md.1970). The fact that the general purpose of the Club is to work for the public good ob-

viously does not deprive the Club of its private status. Necessarily, through its involvement with civic affairs, some publicity has been afforded the Club. But the publicity given to the Club was only incidental to the Club's function of involvement with the community and none of the indirect advertising was designed to increase the patronage of the Club's facilities. Wright v. Cork Club, *supra*.

Further, while the Miami Woman's Club has never admitted a black woman and while membership in the Florida Federation of Women's Clubs is limited by its Articles of Incorporation, Art. IV, to clubs consisting of white women, it nevertheless does not appear that the Miami Woman's Club was formed for the primary purpose of excluding blacks on account of their race. United States v. Johnson Lake, Inc., 312 F.Supp. 1376 (D.C.Ala.1970).

All factors taken together, the court concludes that the privacy of the Club is not a mere sham to evade the Civil Rights Acts. The Miami Woman's Club is indeed private.

(b) *Color of Law:*

Plaintiffs readily concede that if the Club is private, the State must have significantly involved itself with the invidious discrimination to afford constitutional protection to plaintiffs. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

Plaintiffs argue that the Miami Woman's Club and the Florida Federation are quasi-public in nature and are aided by the municipalities of the State as well as the State itself. This argument is based on several factors: the Federation's lease with the city of Lakeland; the sheer size of the defendant Federation throughout the State of Florida; and the purpose of the defendant Club.

The court observes that plaintiffs are entitled to relief, if at all, against the Club only because of its association with the Federation by reason of the Federation's 1954 lease with Lakeland. If the Miami Woman's Club was not a member of the Federation, it would plainly be an "individual invasion of individual rights" and not within the scope of the Fourteenth Amendment. The lease, plaintiffs urge, indicates the encouragement the State has given to these segregated facilities which encouragement has the effect of officially sanctioning segregation.

The court cannot conclude that the lease represents anything other than an arms-length transaction. The city of Lakeland leases property to the Federation for its state headquarters for $1.00 a year for 99 years. At first blush, and as plaintiffs contend, this would appear to be a gratuitous transfer. However, in return for the nominal rental, several obligations are placed upon the Federation. The Federation is required to pay state or county taxes or assessments on the property, an obligation normally reserved to the lessor. The Federation also was required to erect a building on the property within two years of the commencement of the lease which will revert to the city upon termination or cancellation of the lease. The lease contains no restrictions as to racial purposes. *See* Lease, plaintiffs' exhibit 5.

Plaintiffs rely on the case of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), for the contention that the city of Lakeland and the Florida Federation were joint participants in the establishment of the Federation's policy of admitting clubs consisting of. white members only.

*Burton* is easily distinguishable from the instant case. In that case, the city of Wilmington owned the land and building and operated a parking garage on the site. As an incident to the garage, the city leased space for a restaurant which prohibited service to blacks. The court found that a particular and peculiar relationship existed and that simultaneous benefits flowed between the restaurant and the parking facility. Each aided the other's business. The court noted that the restaurant held itself out as a place of public accommodation.

Further, the restaurant served many who used the City's parking garage and thus extended the service of the State in providing food for garage patrons.

While the Federation leases its land from the city of Lakeland, all simile to *Burton* ends with this fact. Neither the Florida Federation nor the Miami Woman's Club are places of public accommodation. Indeed, both proudly and adamantly assert that they are private. Neither defendant could be said to have opened its doors to the public as did the restaurant in *Burton*. There is no evidence that the lease was a part of any municipal plan or that any control is exercised by the City over the property. The building is maintained by the Federation, not the city; and the Federation is liable for ad valorem taxes or assessments against the property. There is no evidence before the court that Lakeland, in fact, encouraged the maintenance of a segregated club by leasing the land to the Federation. *See, e. g.*, Wright v. City of Brighton, Ala., 441 F. 2d 447, 451 (5th Cir. 1971), cert. denied, 404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190 (1971) (enjoining sale by city of formerly public school for maintenance of private school for whites only was in bad faith and obviously done to defeat desegregation mandate) and Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir. 1962), cert. denied, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 170 (1962) (enjoining operation on a segregated basis of golf courses by persons who purchased the courses from the city after the court had enjoined the city from operating them on a racially segregated basis).

In a recent case in this circuit dealing with the involvement necessary to constitute state action which would otherwise be private discrimination, Smith v. Young Men's Christian Ass'n of Montgomery, 462 F.2d 634 (5th Cir. 1972), a class action was brought against the Y. M.C.A. for refusing applications of minor black plaintiffs to its day camp. Evidence showed that the day camp previously had been operated as an all-white camp. Twenty percent of the Y. M.C.A.'s annual income came from the Montgomery United Appeal Fund. In addition, the Y.M.C.A. operated extensive programs for the general public. The Y.M.C.A. pools were the only public pools in Montgomery. Membership in the "Y" was open to the public at large.

The court in *Smith* found that the Y. M.C.A. had a cooperative agreement with the city to coordinate the facilities of the Y.M.C.A. and those of the city to avoid duplication of effort. The agreement, in writing, provided for a working committee which was found by the court to have had a substantial impact on the Y.M.C.A. In addition to this agreement, several resolutions reflected the city's wish to have the Y.M.C.A. provide mass recreation for Montgomery.

The court in *Smith* held that the Y. M.C.A., in discriminating against blacks, had acted as a quasi-public agency and "under color of law" in refusing to allow membership to blacks. In dealing with the Y.M.C.A.'s claim that it enjoyed private club status, the court found that the club was too unselective in its membership policies; private clubs do not derive twenty percent of their revenue from public agencies or provide recreation for an entire city. The Y.M.C.A., therefore, was not a private club under Title 42 U.S.C. § 2000a(e).

More recently, this circuit has held that truly private organizations, who have discriminatory practices, may use public recreational facilities on a periodic basis if there is no significant effect on rights of excluded individuals. Gilmore v. City of Montgomery, 473 F.2d 832 (5th Cir., decided Feb. 9, 1973).

The *Burton, Smith, and Gilmore* cases clarify what type and amount of participation by the state is needed to make discrimination under color of law. Neither benefit to nor participation by the city of Lakeland in the membership policies of the Federation have been shown by plaintiffs. The mere fact that the Federation has a lease from the city of Lakeland, without more, does not make the State a partner in discrimination.

The second factor upon which plaintiffs rely to make the alleged discrimination state action is that the sheer size of the Florida Federation throughout the State of Florida makes any action taken by it state action. The fact that the word "Florida" appears in defendant's name does not make state action present, as asserted by plaintiffs; if this were true, as the Federation points out, any organization containing the name "Florida" would take on color of law, even the "Boston Terrier Club of Florida" and similar organizations.

In Adams v. Miami Police Benevolent Ass'n, Inc., 454 F.2d 1315 (5th Cir. 1972), cert. denied, 409 U.S. 843, 93 S. Ct. 52, 34 L.Ed.2d 82, the defendant operated a canteen at police headquarters, solicited funds from the public using the name "police" and collected $90,000 the previous year, and was represented at staff meetings held at the police department. It also was present at meetings of the city commission as a bargaining agent and used the facilities of the police department to solicit members. In that case, the inclusion of the word "Miami" in the defendant's title, in addition to the word "police", was given some weight in determining state involvement. This total involvement is not present under the facts of this case, however.

For a third basis plaintiffs assert that activities of the Club, such as sponsoring facilities in state parks for handicapped persons and co-chairing the bicentennial celebration of the city of Miami, add up to state involvement. Neither law nor common sense could conclude that any and every action taken by defendant Federation and member clubs like the Miami Woman's Club seeking to promote community and civic affairs constitutes state involvement.

In reaching its decision, the court has paid special attention to two recent decisions of the United States Supreme Court, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) and Tillman v. Wheaton-Haven Recreation Association, Inc., 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973.)

In *Moose Lodge,* the plaintiff was invited by a member of a local moose lodge to the lodge's dining room and bar and was refused service solely because he was black. Plaintiff contended that since the lodge held a liquor license from the State of Pennsylvania that discrimination constituted state action and was therefore violative of the Equal Protection Clause. Plaintiff contested both the membership practices of the lodge as well as its discriminatory policy toward guests.

First, the Court held that plaintiff lacked the standing necessary to challenge the membership practices of the lodge for the reason that, unlike the present case, plaintiff had never sought membership in the lodge.

Second, as to discrimination by the Moose Lodge, the Supreme Court clearly stated that not all private club discrimination violates the Equal Protection Clause. Rather, it is only where "the State [has] 'significantly involved itself with invidious discriminations,' Reitman v. Mulkey, 387 U.S. 369, 380, 87 S. Ct. 1627, 1634, 18 L.Ed.2d 830 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition." Moose Lodge, *supra,* 92 S.Ct. at 1971. Significantly, the liquor license was held to be not sufficient involvement by the state to find for the plaintiffs.

No liquor license is involved in the present case. However, plaintiffs have pointed to the previously mentioned facts of the Federation's size and lease to evidence state involvement. The court finds that these factors proposed by plaintiffs fall short of involvement under the guidelines of *Moose Lodge* to afford relief to plaintiffs.

In the second and most recent Supreme Court case on the subject, Tillman v. Wheaton-Haven Recreation Association, Inc., *supra,* the defendant association operated a community swimming pool with membership limited to whites

and their white guests. Those residing within a certain radius of the association received a preference in membership and needed no recommendation to apply; those living outside the area needed an endorsement from a member as a prerequisite to membership. A member selling his house could convey a first option for membership to his vendee. Plaintiff purchased a home in the preference area from a nonmember of the association and was denied membership in the club for racial reasons.

Principally, the Supreme Court held that Title 42 U.S.C. § 1982[2] applied to the facts to bar the "property-linked preferences" given to residents in the area near the swimming pool. The Supreme Court found that "when an organization links membership benefits to residency in a narrow geographical area, that decision infuses those benefits into the bundle of rights for which an individual pays when buying or leasing within that area. The mandate of 42 U.S.C. § 1982 then operates to guarantee a nonwhite resident who purchases, leases, or holds the property, the same rights as enjoyed by a white resident." *Tillman, supra,* 93 S.Ct. at 1094. While the complaint *sub judice* alleges, *inter alia,* a violation of section 1982, plaintiffs have not shown any deprivation of property rights within that section. The *Tillman* holding is inapplicable to the present case.

The court cannot condone membership policies of the defendant Club and the Federation; however, the court concludes that plaintiffs are not entitled to the relief sought because of defendants' status as private organizations and there is no "symbiotic relationship" shown between the Federation and the State.

The court is left with the inescapable conclusion that plaintiffs have been deprived by defendants, not of their civil rights, but only of civil treatment. It is

Ordered and adjudged that final judgment be, and hereby is entered in favor of defendants and against plaintiffs, and the complaint is hereby dismissed with prejudice and at the cost of plaintiffs.

---

2. "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property."